# IN THE SUPREME COURT OF IOWA

No. 11–1080

Filed August 16, 2013

**STATE OF IOWA,**

Appellee,

vs.

**DENEM ANTHONY NULL,**

Appellant.

---

Appeal from the Iowa District Court for Linn County, Ian K. Thornhill, Judge.

A juvenile challenges his sentence as cruel and unusual under the State and Federal Constitutions. **DISTRICT COURT SENTENCE VACATED AND CASE REMANDED WITH INSTRUCTIONS.**

Mark C. Meyer, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Elisabeth S. Reynoldson, Assistant Attorney General, Gerald A. Vander Sanden, County Attorney, and Jason A. Burns, Assistant County Attorney, for appellee.

**APPEL, Justice.**

By statute, Denem Anthony Null is required to serve at least 52.5 years of his seventy-five-year aggregate sentence for second-degree murder and first-degree robbery. Because he was sixteen years and ten months old at the time of his offenses, he will not be eligible for parole until he attains the age of sixty-nine years and four months. Null argues his lengthy mandatory prison sentence is invalid under the cruel and unusual punishment provisions of the Iowa and United States Constitutions. In the alternative, Null argues the trial court abused its discretion in imposing consecutive sentences.

Null also raises a number of challenges to his underlying convictions. According to Null, he was not properly informed of the elements of the offenses to which he pled guilty and, as a result, his guilty plea in this case is invalid. Null further argues his counsel provided ineffective assistance by failing to ensure he knowingly and voluntarily waived his right to a reverse-waiver hearing. Finally, Null asks us to preserve for postconviction review his claim that his counsel provided ineffective assistance by not consulting with Null prior to withdrawing his request for a transfer of jurisdiction to juvenile court.

For the reasons stated below, we affirm Null's conviction, but vacate his sentence and remand the case to the district court for resentencing consistent with this opinion.

## I. Background Facts and Prior Proceedings.

In 2010, the State charged Null with first-degree murder, a class "A" felony, *see* Iowa Code § 707.2 (2009), after he shot Kevin Bell with a handgun during the commission of a robbery at Bell's apartment. Null was sixteen years and ten months old at the time. Iowa Code section 232.8(1)(*c*) required the State to charge Null as an adult in the district

court. Null filed a motion to transfer jurisdiction to the juvenile court. Prior to the hearing, Null withdrew his motion and entered into a plea agreement with the State. Null agreed to plead guilty to second-degree murder and first-degree robbery in exchange for dismissal of the first-degree murder charge.

Second-degree murder carries a maximum sentence of fifty years. *Id.* § 707.3. First-degree robbery carries a maximum sentence of twenty-five years. *Id.* § 711.2; *id.* § 902.9(2). Further, convictions for each crime are subject to mandatory minimum sentences of seventy percent. *Id.* § 902.12(1), (5). Because Null's alleged actions occurred prior to the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), he would have received a mandatory sentence of life in prison without the possibility of parole if he had pled guilty to first-degree murder. *See* Iowa Code § 707.2; *id.* § 902.1. The parties further agreed that the State would be allowed to argue at sentencing that Null's sentences should run consecutively and that Null would be allowed to argue that they run concurrently. Thus, the reason Null took the plea deal is readily apparent—by taking it he gained the opportunity to be released from prison on parole, albeit not until he reached the age of sixty-nine years and four months if the court imposed consecutive sentences.

Null was an only child with a difficult childhood. Null's presentence investigation report indicated he had been arrested four times, dating back to 2004 when he was just eleven years old, once each for assault and assault causing bodily injury and twice for disorderly conduct. Though he never received an adjudication of delinquency, he did successfully complete one informal adjustment, during which he was placed at Tanager Place, a residential facility providing specialized

treatment to children with behavior and psychiatric disorders. The remainder of his charges was dismissed. The report also indicated Null dropped out of school in eleventh grade because he left his father's home. Prior to that time, however, Null had been expelled from school for altercations with other students and placed in behavior disorder classes, which he apparently completed prior to dropping out. The report also indicated Null did not know whether his parents were working.

Null's father lived in Kansas City, and although he lived with his mother, she frequently sent him to live with his grandmother. He indicated that he did not like either of his parents because they "constantly put down" the other and that he was closest to his grandmother. Null's grandmother indicated Null's parents never treated each other or Null well during his childhood and even asserted that Null and his father were involved in a physical altercation at one point. Null's mother, who was diagnosed with bipolar disorder, but did not take medication, had a history of drug and alcohol abuse, criminal convictions, and violent behavior. Null indicated he did not get along well with his father because his father was "always talking down" his mother. Further, Null had been a child in need of assistance since 2006. He was subsequently placed in numerous shelters and treatment programs, but went on the run from most of them. In fact, Null was on the run at the time he committed the offenses leading to the sentence at issue here. Null stated he did not drink alcohol even though his mother taught him to "sip beer" as a baby. Null further stated that though he had used marijuana twice, he did not use illegal substances.

According to the minutes of testimony, Null stole a .22-caliber pistol from a friend. At some point thereafter, Null went with his brother and cousin to Bell's apartment to steal a pound of marijuana. During

the robbery, Null shot Bell in the head. When occupants of another room in the apartment appeared, Null and the others fled the scene.

At Null's sentencing hearing, the court stated that it had no discretion in imposing the fifty-year sentence for second-degree murder or the twenty-five-year sentence for first-degree robbery, but that it did have discretion to determine whether the sentences should run concurrently or consecutively.

The State took exception to the recommendation of the presentence investigation report.[1] In recommending that Null receive consecutive sentences, the State directed the court to the presentence report. The State said,

> He had a long history of offender interventions that are located on pages 6 and 7 of the presentence report. He had informal adjustments and placed at Foundation 2, Tanager Place, the Linn County Detention Center and just more than a dozen placements and intervention attempts prior to this case, Your Honor. In fact, he was on run from Tanager Place when he committed this murder.

In asking for a concurrent sentence, Null's counsel referenced the fact that Null was only sixteen years old at the time of the killing. He stated:

> My client, Your Honor, at age 16 made a bad decision. And like many people that are age 16 they are not capable of making good decisions sometimes. They are unable to think about what if, what is beyond this immediate decision that I am making.
>
> . . . .
>
> As the presentence investigation reports, this was a one-time occurrence. It's where a 16-year-old didn't ask

---

[1]The presentence investigation report recommended concurrent sentences for Null. The report indicated that it took Null's age into consideration, that the convictions were based on a single incident, that he would have served a substantial portion of his fifty-year sentence by the time the twenty-five-year sentence was imposed in the event of consecutive sentences, and that concurrent sentences would hold Null accountable while protecting the community.

what if and several families have been damaged by this tragedy.

. . . .

If you look at the biographical information on Mr. Null, this was almost predetermined. His involvement with the court system was almost predetermined.

It is not an excuse, because many people have come from backgrounds such as this and have not found themselves in this situation.

Mr. Null did not have the mentoring, did not have the role models, did not have the upbringing that some of us are fortunate enough to have. He didn't have the time to learn how to look beyond his immediate actions to what might result from those actions.

In sentencing Null, the district court indicated that because it had the benefit of sentencing Null's codefendants the week before, it had a frame of reference with which to evaluate Null's conduct for sentencing (each codefendant received twenty-five-year sentences and are eligible for parole after 17.5 years). The court stated that it had read the presentence investigation report and that there had been "significant juvenile court intervention" with Null dating back to early 2005. The court further found the argument that Null did not receive structure or mentoring did not carry a lot of weight because the State had attempted to place Null on numerous occasions and Null ran from them. The court also noted there had been a comment that Bell "came at" Null just prior to the shooting, which the court considered "a little bit of a minimization," but not a justification. Ultimately, the court ordered Null to serve his sentences consecutively, but indicated he would still have an opportunity to seek parole down the road. The court stated it had considered the nature and circumstances of the offenses, Null's history and characteristics, including his age and prior court interventions, and the recommendation of both counsel. The court concluded,

I find the sentence that I have imposed offers [Null] the maximum opportunity for rehabilitation, balanced against the interest of the community, not only protecting the community but also in receiving justice for what can only be described as a tragedy for all.

## II.  Scope of Review.

A defendant may challenge his sentence as inherently illegal because it violates the Iowa or Federal Constitutions at any time.  *State v. Bruegger*, 773 N.W.2d 862, 872 (Iowa 2009).  We review Null's constitutional challenges to his sentence de novo.  *Id.* at 869.

With respect to Null's ineffective-assistance-of-counsel claims, Null may raise them even though he did not file a motion in arrest of judgment.  *State v. Keene*, 629 N.W.2d 360, 364 (Iowa 2001).  Although we ordinarily preserve ineffective-assistance-of-counsel claims for postconviction relief actions where a proper record can be developed, "we will address such claims on direct appeal when the record is sufficient to permit a ruling."  *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005).

## III.  Ineffective Assistance.

Null raises ineffective-assistance claims with regard to his plea colloquy and the withdrawal of his request to transfer to juvenile court.  To succeed on a claim of ineffective assistance of counsel, Null must establish that his trial counsel failed to perform an essential duty and that prejudice resulted.  *State v. Schminkey*, 597 N.W.2d 785, 788 (Iowa 1999).  Null must establish both prongs by a preponderance of the evidence.  *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006).

### A.  Adequacy of the Plea Colloquy.

1. *Positions of the Parties.*  Null asserts his counsel was ineffective because his counsel permitted him to plead guilty to murder in the second degree without an adequate explanation from the district court of the required element of malice aforethought.  Null also claims his

counsel was ineffective for allowing him to plead guilty when the district court had failed to properly advise him on the issue of punishment. Though Null concedes that the district court indicated the maximum punishment of each offense and that if the sentences ran consecutively, his sentence would total seventy-five years, Null argues the district court did not specifically ensure he understood that by accepting the plea deal he could be sentenced to serve seventy-five years in prison with no chance of parole for 52.5 years. *See, e.g., State v. White*, 587 N.W.2d 240, 246 (Iowa 1998) (holding that the district court must explain to a defendant the possibility of consecutive sentences).

The State responds that it is not required that the district court discuss each element of the crime with a defendant to ascertain his understanding of the nature of the offense. The State, however, seems to characterize Null's claim as questioning whether there was substantial evidence in the record to support the guilty plea to second-degree murder. In any event, the State argues Null has failed to demonstrate prejudice. According to the State, Null has failed to show a reasonable probability he "would have insisted on going to trial." *State v. Tate*, 710 N.W.2d 237, 240 (Iowa 2006).

On the issue of length of sentence, the State notes the district court explained to Null the sentences could run consecutively. The State points to the district court's statements that "a consecutive sentence would be one occurring after the other," and that because second-degree murder carries a fifty-year sentence and first-degree robbery carries a twenty-five-year sentence, "[c]onsecutive would mean, essentially, 75 years in prison." Under the circumstances, the State contends the district court did not induce Null to plead guilty and substantially

complied with its duty to ensure Null knew about the maximum possible punishment.

2. *Discussion.* On the question of malice aforethought, we conclude the district court gave an adequate explanation. The district court advised Null that malice was "a state of mind which leads one to intentionally do a wrongful act for an unlawful purpose." The court further advised Null, "And malice aforethought basically just means that you have this state of mind for some—it can be a brief time prior to committing the act. It could be hours, minutes, days, or even a split second." The court continued, "It just has to be a state of mind that you had before the shooting."

We have stated malice aforethought requires a "fixed purpose or design to do some physical harm to another which exists prior to the act committed." *State v. Sharpe*, 304 N.W.2d 220, 226 (Iowa 1981) (citation and internal quotation marks omitted). It is true, as Null asserts, that the district court's colloquy did not mention "physical harm" but instead cited a "wrongful act." While the district court may have somewhat vaguely referred to a wrongful act, the statement was made in the context of the shooting. The shooting was obviously an act that caused physical harm. To be sure, the district court had just informed Null that the State would have to "show that as a result of the shooting Mr. Bell died."

Under our caselaw, "the court need not review and explain each element of the crime *if* it is 'apparent in the circumstances the defendant understood the nature of the charge.'" *State v. Loye*, 670 N.W.2d 141, 151 (Iowa 2003) (quoting *State v. Smith*, 300 N.W.2d 90, 92 (Iowa 1981)). Considered in the full context of the colloquy, we conclude Null was reasonably informed of and understood the malice aforethought element.

We next consider Null's claim that the district court did not adequately explain the potential penalties to him before he pled guilty. We have held that the district court must adequately explain the penalties, *State v. Boone*, 298 N.W.2d 335, 337–38 (Iowa 1980), and inform the defendant of the difference between concurrent and consecutive sentences, *White*, 587 N.W.2d at 246.

At the plea bargain colloquy, the district court advised Null that on the charge of murder in the second degree, he faced a maximum penalty of fifty years in prison subject to a requirement that he serve seventy percent of that sentence before he would be eligible for parole. With respect to robbery in the first degree, the district court advised Null the crime carried a twenty-five-year maximum sentence, subject to a requirement that he serve seventy percent of the sentence before he would be eligible for parole. The district court then advised Null that "[c]onsecutive would mean, essentially, 75 years in prison." Null stated he understood each statement of the district court.

On this record, we conclude the district court accurately advised Null of the potential sentence that could result from his plea bargain. It is true that when the district court described the impact of consecutive sentences, it did not do the math insofar as explaining that pursuant to the mandatory minimums Null would be in prison for at least 52.5 years under the plea agreement. The district court simply said that if the sentences ran consecutively, it would mean seventy-five years in prison. Yet, just a few minutes earlier, the district court described the effect of mandatory minimum sentences for each crime. Null stated on the record that he understood that the crimes to which he would plead carried mandatory minimum sentences. There is nothing in the record to

contradict Null's statement. We therefore find that the district court complied with the requirements of *Boone* and *White.*

### B. Withdrawal of Motion to Transfer.

1. *Positions of the Parties.* Null asserts his counsel was ineffective in connection with the withdrawal of Null's request to transfer the case to juvenile court. Under Iowa Code section 232.8(1)(*c*), certain felony violations are excluded from the jurisdiction of the juvenile court and are prosecuted in district court "unless the court transfers jurisdiction of the child to the juvenile court upon motion and for good cause." Null claims that although the right to transfer to juvenile court is statutory, the State must show a knowing, voluntary, and intelligent waiver of the right. Further, he asserts the district court, in its colloquy, should have reviewed waiver of the right. Null asks that we preserve the issues related to the withdrawal of the motion to transfer for postconviction review.

The State responds that Null's claim is essentially a challenge to the authority of the district court and may be waived. *State v. Emery,* 636 N.W.2d 116, 123 (Iowa 2003). The State recognizes, however, that Null raises the claim in the form of an ineffective-assistance-of-counsel claim for which the normal error preservation rules do not apply. On the merits, the State contends Null's counsel was not ineffective because the motion to transfer was doomed to fail in light of the seriousness of the offenses and was "not [a claim] worth raising." *Millam v. State,* 745 N.W.2d 719, 722 (Iowa 2008) (citation and internal quotation marks omitted). Further, the State argues that Null has not shown prejudice and that any claim arising from the transfer issue should be reserved for possible postconviction relief.

2. *Discussion.* It is, perhaps, conceivable that a motion to transfer might amount to a claim "worth raising" under *Millam* as there is no apparent downside to the motion and considerable advantage to the defendant should the motion be granted. Yet, the record on this appeal does not establish the necessary prejudice required to support an ineffective-assistance claim. *See Wills*, 696 N.W.2d at 22. As a result, we decline to address it on this direct appeal.

**IV. Validity of Sentence.**

**A. Introduction.** Null argues his 52.5-year mandatory minimum sentence for crimes committed when he was sixteen years old amounts to a de facto life sentence in violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment. In support of his position, Null cites the trilogy of recent United States Supreme Court decisions, which, in addition to *Miller*, includes *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), and *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). Null recognizes his sentence is not formally a life sentence, but argues his potential release after serving 52.5 years is essentially the equivalent of a life sentence. In support of his claim that his long prison term amounts to a life sentence, he cites a National Vital Statistics Report indicating the life expectancy of a twenty-year-old black male is 51.7 years. In any event, Null argues that even if he were to live to be paroled, release when he is elderly and infirm to die on the streets after spending all of his adult years in prison would be little, if at all, better than dying in prison.

In the alternative, Null asks us to find his sentence unlawful under the cruel and unusual punishment provision of article I, section 17 of the Iowa Constitution. In support of his argument, he cites *Bruegger*. In *Bruegger,* no party argued that an approach different than the federal

standards for cruel and unusual punishment should apply under the Iowa Constitution. 773 N.W.2d at 883. Nonetheless, in *Bruegger* we applied established federal principles in what at the time appeared to be a more stringent fashion than federal precedent. *Id.* at 883–86.

Null invites us to take the same type of approach in this case to provide him with relief under the cruel and unusual punishment provision of the Iowa Constitution if his federal cruel and unusual punishment claim fails. As in *Bruegger,* Null does not invite us to develop a substantive standard for cruel and unusual punishment different from that employed by the United States Supreme Court, but suggests we apply the federal standard independently under the Iowa Constitution.

Null also challenges the decision of the district court to run his fifty-year sentence for second-degree murder and his twenty-five-year sentence for first-degree robbery consecutively rather than concurrently. Null asserts the district court erred in considering the sentences received by coparticipants in deciding that Null's sentences should run consecutively. He further asserts the district court, in imposing consecutive sentences, failed to give adequate consideration to his status as a juvenile and the teachings of *Roper*, *Graham*, *Miller*, and *Bruegger*. Null asserts the district court further erred when sentencing Null by assuming Null had committed first-degree murder when there was no support for this assumption in the record. Finally, Null claims the district court erred by claiming Null "has the opportunity down the road to seek parole" when he would only be eligible near the end of his life expectancy.

The State responds by urging us to defer to legislative judgments on the matter of punishment. It notes the holdings in *Graham* and *Miller*

are limited to "juvenile offenders sentenced to life without parole," *see, e.g.*, *Graham*, 560 U.S. at ___, 130 S. Ct. at 2023, 176 L. Ed. 2d at 838, and that, as a result, these cases have no applicability to Null who received a sentence for a term of years. Because *Graham* and *Miller* have no application to Null's case, the State contends, Null is left with a "gross proportionality" challenge under *Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (plurality opinion), *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (plurality opinion), and *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). Using the gross proportionality formulation of these cases, the State asserts Null's sentence falls far short of the required showing in these cruel and unusual punishment cases.

On the question of running the sentences consecutively rather than concurrently, the State argues the district court is entitled to broad discretion. *See State v. Wright*, 340 N.W.2d 590, 593 (Iowa 1983). The State notes Null's documented involvement with the juvenile justice system, his antisocial behavior, and his lack of remorse. The State asserts that while the district court must explain its sentencing decision, the statement may be terse and succinct so long as the brevity "does not prevent review of the exercise of the trial court's sentencing discretion." *State v. Johnson*, 445 N.W.2d 337, 343 (Iowa 1989). The State observes that the district court ran the sentences consecutively based upon the history and characteristics of the defendant, including his age, prior interventions, lack of remorse, and the facts of the crime, and that the trial court's imposition of consecutive sentences cannot be considered an abuse of discretion.

In order to address the issues raised in this appeal, we begin with an overview of how juveniles have been treated in our legal system.

Against this backdrop, we then consider generally the contours of the Cruel and Unusual Punishments Clause of the Eighth Amendment as interpreted by the United States Supreme Court. Next, we tighten our legal focus by examining recent cases of the United States Supreme Court dealing with juvenile offenders.

**B. Overview of Juveniles, Legal Responsibility, and Diminished Culpability.**

1. *Evolution of the treatment of juveniles in American law.* At common law, the notion was that youth under the age of seven lacked criminal capacity, that youth between seven and fourteen were presumed to lack criminal capacity, and that youth over fourteen were presumed to have the capacity to commit criminal acts. Barry C. Feld, *Unmitigated Punishment: Adolescent Criminal Responsibility and LWOP Sentences*, 10 J.L. & Fam. Stud. 11, 14 n.11 (2007) [hereinafter Feld]; Andrew Walkover, *The Infancy Defense in the New Juvenile Court*, 31 UCLA L. Rev. 503, 510–11 (1984) [hereinafter Walkover]. Thus, in a prosecution of a youth aged between seven and fourteen years, the state was required to overcome the presumption that the youth lacked the mental capacity to commit crimes "by showing that the child knew the wrongfulness of his act." Walkover, 31 UCLA L. Rev. at 511. For the first hundred years or so after the founding of the United States, juveniles, if they were tried at all, were tried in adult courts. Feld, 10 J.L. & Fam. Stud. at 13–14.

In the late 1890s, the Progressives began to press for the establishment of juvenile courts that would seek to promote the welfare of juvenile offenders. *See In re Gault*, 387 U.S. 1, 15–16, 87 S. Ct. 1428, 1437, 18 L. Ed. 2d 527, 539 (1967); *see also* Feld, 10 J.L. & Fam. Stud. at 15–16. The efforts to establish a separate track for dealing with juvenile offenders was largely successful. *See In re Gault,* 387 U.S. at

14–15, 87 S. Ct. at 1437, 18 L. Ed. 2d at 539. *See generally* Feld, 10 J.L. & Fam. Stud. at 15–18; Sanford J. Fox, *Juvenile Justice Reform: An Historical Perspective*, 22 Stan. L. Rev. 1187, 1222–30 (1970).

But the results were not always satisfactory as translating the rehabilitative model into reality proved difficult. By the 1960s, it became apparent that the purpose of juvenile court proceedings was no longer primarily to protect the best interest of the child and was instead becoming more punitive in nature. As a result, in 1966 the Supreme Court in *Kent v. United States*, 383 U.S. 541, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966), and *In re Gault* required that many of the protections afforded adult offenders in the criminal process also applied in juvenile courts. *See In re Gault*, 387 U.S. at 33–58, 87 S. Ct. at 1446–60, 18 L. Ed. 2d at 549–63 (requiring notice, a fair hearing, the assistance of counsel, the opportunity to confront and cross-examine witnesses, the privilege against self-incrimination, and the right to an appeal); *Kent*, 383 U.S. at 556–57, 86 S. Ct. at 1055, 16 L. Ed. 2d at 94–95 (requiring procedural safeguards in judicial waiver proceedings). Though designed to protect juveniles, *Kent* and *In re Gault* may have stimulated a mindset of increased exposure of youth to adult criminal sentences.

2. *The law recognizes adolescents as different.* Many areas of the law reflect the differences between youth and adults. For instance, adolescents are prohibited by law from engaging in certain behavior thought to be risky. In Iowa, youth under age twenty-one are not permitted access to alcohol, Iowa Code § 123.47, or to engage in pari-mutuel betting, *id.* § 99D.11(7). Further, those under age eighteen are not permitted access to tobacco products, *id.* § 453A.2(2), or to obtain tattoos, *id.* § 135.37(2). The transfer of firearms to a minor is a criminal offense. *Id.* § 724.22. The State grants graduated driver's licenses to

youth between the ages of fourteen and seventeen under certain restrictions. *Id.* § 321.180B.

Youth are also prohibited from engaging in a number of important transactions and from participating in important aspects of citizenry. The period of minority generally extends to the age of eighteen, unless the minor is married. *Id.* § 599.1. Minors may disavow contracts within a reasonable period of time after obtaining majority. *Id.* § 599.2. Minors may not serve as a fiduciary. *Id.* § 633.63. Minors may not marry unless they are sixteen or seventeen years old, have their parents' consent, and a judge approves. *Id.* § 595.2(4), *held unconstitutional in part on other grounds by Varnum v. Brien*, 763 N.W.2d 862, 906 (Iowa 2009). Minors may not vote. *Id.* § 48A.5(2)(*c*). Minors may not sit on a jury. *Id.* § 607A.4(1)(*a*).

Juvenile offenders are generally not held criminally responsible. *Id.* § 232.8(1). The criminal law also provides special protection to adolescents in sexual matters. The commission of a lascivious act with a minor is a serious misdemeanor. *Id.* § 709.14. A teacher who commits sexual conduct with a student is guilty of an aggravated misdemeanor or class "D" felony depending on the presence of a pattern, practice, or scheme. *Id.* § 709.15(5). A person who provides a pass to or who admits a minor to a premises where obscene material is exhibited, or who sells, gives, delivers, or provides obscene material to a minor commits either a serious or aggravated misdemeanor depending on the age of the minor. *Id.* § 728.3.

Finally, Iowa law recognizes that juveniles lack judgment to exercise constitutional rights in legal settings. Iowa Code section 232.45(11)(*b*) provides that statements made by a juvenile at an intake or

waiver hearing are inadmissible in a subsequent criminal trial in the prosecution's case in chief.

3. *Expanding juvenile sanctions.*  A perceived increase in juvenile crime led to dire predictions for the future.  Princeton University Professor John Dilulio, Jr. predicted an onslaught of "tens of thousands of severely morally impoverished juvenile super-predators."  John J. Dilulio, Jr., *The Coming of the Super-Predators*, The Weekly Standard, November 27, 1995, at 23; *see also* Feld, 10 J.L. & Fam. Stud. at 31 & n.108 (citing politicians who warned of the coming generation of "super-predators").  Criminologist James Alan Fox observed that " 'unless we act today, we're going to have a bloodbath when these kids grow up.' "  Brief of Jeffrey Fagan, et al. as Amici Curiae in Support of Petitioners, at 14 & n.13, *Miller v. Alabama*, 567 U.S. ___ (2012) (Nos. 10–9647, 10–9646) (quoting Laurie Garrett, *Murder by Teens Has Soared Since '85*, N.Y. Newsday, Feb. 18, 1995).

During this time frame, states began to enact laws expanding the exposure of juveniles to criminal sanctions by encouraging the trial of juvenile offenders in adult rather than juvenile courts.  *See, e.g.*, 1995 Iowa Acts ch. 191, § 8 (amending Iowa Code § 232.8 to exclude juveniles sixteen years of age and older from the jurisdiction of the juvenile court for the alleged commission of certain offenses).  According to one observer, the politics of criminal law lead to a "one-way ratchet" of ever increasing criminal penalties without serious legislative consideration of their overall effect on the criminal justice system.  William J. Stuntz, *The Pathological Politics of Criminal Law*, 100 Mich. L. Rev. 509, 547–49 (2001).

The fear of juvenile predators may be reflected in sentencing practices nationwide.  According to one study, "in eleven out of the

seventeen years between 1985 and 2001, youth convicted of murder in the United States were *more* likely to enter prison with a life without parole sentence than adult murder offenders." Human Rights Watch & Amnesty International, *The Rest of Their Lives: Life Without Parole for Child Offenders in the United States* 2 (2005). Another study during approximately the same time frame indicates that for violent, weapons-related, and other crimes, juvenile offenders transferred to criminal court were more often sentenced to prison and for longer periods of time than their adult counterparts. Donna Bishop & Charles Frazier, *Consequences of Transfer, in The Changing Borders of Juvenile Justice: Transfer of Adolescents to the Criminal Court* 227, 234–36 (Jeffrey Fagan & Franklin E. Zimmering eds., 2000).

4. *Developments of modern science.* While legislative changes in the 1990s ensured more juveniles would be treated as adults in the criminal justice system, developments in social psychology and neuroscience have reinforced traditional notions that juveniles and adults are, in fact, quite different. The United States Supreme Court relied heavily upon the evolving science in its trilogy of recent Eighth Amendment cases involving juveniles. In *Roper*, the Court cited scientific support for its propositions that juveniles and adults differ in significant ways for the purpose of Eighth Amendment analysis. *See* 543 U.S. at 569–73, 125 S. Ct. at 1195–97, 161 L. Ed. 2d at 21–24 (citing Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty,* 58 Am. Psychologist 1009 (2003), and Jeffrey Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective,* 12 Developmental Rev. 339 (1992)). In *Graham*, the Court referenced amicus briefs pointing out that "developments in psychology and brain

science continue to show fundamental differences between juvenile and adult minds." 560 U.S. 48, ___, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841. Finally, in *Miller*, the Court, again relying on scientific developments, indicated the scientific underpinnings of *Roper* and *Graham* had "become even stronger." 567 U.S. at ___, 132 S. Ct. at 2464 n.5, 183 L. Ed. 2d at 419 n.5. As will be set forth below, scientific advances confirmed what the Court had already known for decades about juveniles. *See, e.g, Johnson v. Texas*, 509 U.S. 350, 367, 113 S. Ct. 2658, 2668–69, 125 L. Ed. 2d 290, 306 (1993) (noting a juvenile's "lack of maturity," and "underdeveloped sense of responsibility" that often leads to "impetuous and ill-considered actions and decisions"); *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S. Ct. 869, 877, 71 L. Ed. 2d 1, 11 (1982) ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological change.").

While the number of studies cited in the amicus briefs before the Supreme Court in *Miller* were quite extensive,[2] the unfolding science relied upon by the United States Supreme Court has been recently synthesized by law professor Elizabeth S. Scott and psychologist Laurence Steinberg, whose work, as noted above, was cited extensively by the Supreme Court in *Roper*. According to Scott and Steinberg, social

---

[2]In particular, the scientific studies were surveyed and synthesized in the Brief for the American Psychological Ass'n, American Psychiatric Ass'n and National Ass'n of Social Workers as Amici Curiae in Support of Petitioners, *Miller v. Alabama*, 567 U.S. ___ (2012) (Nos. 10–9647, 10–9646), the Brief for the American Medical Ass'n and the American Academy of Child & Adolescent Psychiatry as Amici Curiae in Support of Neither Party, *Miller v. Alabama*, 567 U.S. ___ (2012) (Nos. 10–9647, 10–9646), and the Brief of J. Lawrence Aber, et al. as Amici Curiae in Support of Petitioners, *Miller v. Alabama*, 567 U.S. ___ (2012) (Nos. 10–9647, 10–9646). The studies cited in these briefs support the view expressed in *Roper*, *Graham*, and *Miller* that adolescents are less capable of mature judgment, more vulnerable to negative external pressure, and have greater capacity for change and reform than adults.

scientists recognized that juveniles achieve the ability to use adult reasoning by mid-adolescence, but lack the ability to properly assess risks and engage in adult-style self-control. Elizabeth S. Scott & Laurence Steinberg, *Rethinking Juvenile Justice* 34 (2008). The influence of peers tends to replace that of parents or other authority figures. *Id.* at 34, 38–39. Risk evaluation is not generally developed. *Id.* at 34, 40–43. Adolescents also differ from adults with respect to self-management and the ability to control impulsive behavior. *Id.* at 43–44. Finally, identity development, which is often accompanied by experimentation with risky, illegal, or dangerous activities, occurs in late adolescence and early adulthood. *Id.* at 50–52.

As the body of psychosocial studies grows, so too does the understanding of the implications of adolescence. For instance, the human brain continues to mature into the early twenties. *Id.* at 44. Much of this development occurs in the frontal lobes, specifically, in the prefrontal cortex, which is central to "executive functions," such as reasoning, abstract thinking, planning, the anticipation of consequences, and impulse control. *Id.* (internal quotation marks omitted). Recent studies show that through adolescence and into early adulthood, the regions of the brain and systems associated with impulse control, the calibration of risk and reward, and the regulation of emotions undergo maturation. *Id.* at 45. In short, "[t]he research clarifies that substantial psychological maturation takes place in middle and late adolescence and even into early adulthood." *Id.* at 60.

Further, the science establishes that for most youth, the qualities are transient. That is to say, they will age out. A small proportion, however, will not, and will catapult into a career of crime unless incarcerated. *Id.* at 53 (estimating that only about five percent of young

offenders will persist in criminal activity into adulthood). Unfortunately, however, it is very difficult to identify which juveniles are "adolescence-limited offenders," whose antisocial behavior begins and ends during adolescence and early adulthood, and those who are "life-course-persistent offenders" whose antisocial behavior continues into adulthood. *Id.* at 54 (internal quotation marks omitted); *see also* Beth A. Colgan, *Constitutional Line Drawing at the Intersection of Childhood and Crime*, 9 Stan. J. C.R. & C.L. 79, 81–85 (2013) (summarizing advances in brain imaging and social science); Elizabeth S. Scott & Laurence Steinberg, *Social Welfare and Fairness in Juvenile Crime Regulation*, 71 La. L. Rev. 35, 64–66 (2010); Elizabeth S. Scott & Laurence Steinberg, *Blaming Youth*, 81 Tex. L. Rev. 799, 811–21 (2003).

5. *Waves of "superpredators" fail to appear.* The predictions of the mid-1990s that thousands of juvenile superpredators would soon appear and threaten public safety did not materialize. According to a United States Surgeon General's report, there was no support for the conclusion that youth in the early 1990s—the time when some were predicting an onslaught of superpredators—were involved in crime more violent or more vicious than in earlier years. David S. Tanenhaus & Steven A. Drizin, *"Owing to the Extreme Youth of the Accused": The Changing Legal Response to Juvenile Homicide*, 92 J. Crim. L. & Criminology 641, 643 n.9 (2002) [hereinafter Tanenhaus & Drizin] (citing Dep't of Health & Human Servs., *Youth Violence: A Report of the Surgeon General* 5 (2001)). By the time *Miller* reached the United States Supreme Court in 2012, Professors Dilulio and Fox had recanted their views. They joined an amicus brief in *Miller* that recognized Dilulio's role in predicting a wave of juvenile superpredators and Fox's prediction of a "bloodbath when these kids grow up." *See* Brief of Jeffrey Fagan, et al. as Amici Curiae in

Support of Petitioners, at 14–19, *Miller*, 567 U.S. \_\_\_. They further declared that these predictions did not come to pass, that juvenile crime rates had in fact decreased over the recent decades, that state legislative actions in the 1990s were taken during "an environment of hysteria featuring highly publicized heinous crimes committed by juvenile offenders," and that recent scientific evidence and empirical data invalidated the juvenile superpredator myth. *Id.* at 15, 18–28. Further, they asserted that neither the absence of a generation of superpredators nor the decline in juvenile crime rates were due to incarceration of the purported superpredators or any deterrent effect of harsher criminal penalties. *Id.* at 29–36.

6. *Question of diminished culpability.* The traditional limitations on juvenile actions and the science presented above suggests that juveniles as a general matter should have diminished culpability for criminal activities. As noted in *Tison v. Arizona*, 481 U.S. 137, 156, 107 S. Ct. 1676, 1687, 95 L. Ed. 2d 127, 143 (1987), "[d]eeply ingrained in our legal tradition is the idea that the more purposeful is the criminal conduct, the more serious is the offense . . . ." The American Bar Association has taken the position for years that juveniles have diminished culpability that should be recognized in criminal sentencing. Brief of the ABA as Amicus Curiae in Support of Petitioners, at 6–10, 16, *Miller v. Alabama*, 567 U.S. \_\_\_ (2012) (Nos. 10–9647, 10–9646). The question is whether a juvenile's sentence that does not reflect the diminished culpability of youth could result in a violation of the cruel and unusual punishment provisions of either the State or Federal Constitution.

**C. Overview of Cruel and Unusual Punishment Under the Eighth Amendment.**

1. *Introduction.* The Eighth Amendment declares: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. As has been noted by scholars, the opaque phraseology of the Cruel and Unusual Punishments Clause gives rise to more questions than it answers. Douglas A. Berman, Graham *and* Miller *and the Eighth Amendment's Uncertain Future,* 27 Crim. Just. 19, 23 (2013). Nonetheless, a few baseline principles emerge from the cases of the United States Supreme Court.

The Eighth Amendment has long been thought to prohibit torture or barbaric punishment. S*ee, e.g.,* Anthony F. Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning*, 57 Cal. L. Rev. 839, 839 (1969); Note, *What is Cruel and Unusual Punishment*, 24 Harv. L. Rev. 54, 55–56 (1910); *see also In re Kemmler,* 136 U.S. 436, 446–47, 10 S. Ct. 930, 933, 34 L. Ed. 519, 523–24 (1890). This strand of Eighth Amendment jurisprudence is implicated in the current debate over the use of lethal injection or the electric chair to execute those convicted of heinous crimes. *See* Deborah W. Denno, *When Legislatures Delegate Death: The Troubling Paradox Behind State Uses of Electrocution and Lethal Injection and What it Says About Us,* 63 Ohio St. L.J. 63, 65–66, 72–77 (2002).

The Supreme Court for the last century, however, has held that the Eighth Amendment also embraces a proportionality principle, expressed in the truism with ancient roots that the punishment should fit the crime. As noted in *Weems v. United States*, 217 U.S. 349, 367, 30 S. Ct. 544, 549, 54 L. Ed. 793, 798 (1910), the right to be free from cruel and unusual punishment flows from the basic "precept of justice that punishment for crime should be graduated and proportioned to offense." Similarly, in *Robinson v. California,* 370 U.S. 660, 667, 82 S. Ct. 1417,

1421, 8 L. Ed. 2d 758, 763 (1962), the Court recognized the proportionality principle by noting, "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold."

Critics have noted that while the Supreme Court has embraced the notion of proportionality, its application of that general principle has not been very consistent.[3]  For example, in *Rummel v. Estelle*, 445 U.S. 263, 271–76, 100 S. Ct. 1133, 1138–40, 63 L. Ed. 2d 382, 389–92 (1980), the Court appeared to be on the verge of eliminating proportionality review, but then revived it shortly thereafter in *Solem*, 463 U.S. at 284–90, 103 S. Ct. at 3006–10, 77 L. Ed. 2d at 645–49.  In *Harmelin*, the concurring opinion of Justice Kennedy embraced proportionality, *see* 501 U.S. at 996–97, 111 S. Ct. at 2702, 115 L. Ed. 2d at 866 (Kennedy, J., concurring), but the result in the case allowed a very stiff penalty to stand for a drug-related crime, at least for the purposes of federal constitutional law, *id.* at 996, 111 S. Ct. at 2702, 115 L. Ed. 2d at 865 (plurality opinion).  In *Ewing*, the Court again seemed to embrace proportionality, but showed great deference to legislative bodies in upholding a lifetime conviction under California's three strikes law after the defendant stole three golf clubs.  538 U.S. at 28–30, 123 S. Ct. at 1189–90, 155 L. Ed. 2d at 122–23 (plurality opinion).

---

[3] *See, e.g.*, Ian P. Farrell, *Gilbert & Sullivan and Scalia: Philosophy, Proportionality, and the Eighth Amendment*, 55 Vill. L. Rev. 321, 322 & n.11 (2010) (noting the justices' "chronic disagreement about the precise contours" of proportionality); Donna H. Lee, *Resuscitating Proportionality in Noncapital Criminal Sentencing*, 40 Ariz. St. L.J. 527, 530 (2008) (characterizing Supreme Court as "fractiously divided" in its approach to proportionality); Youngjae Lee, *The Constitutional Right Against Excessive Punishment*, 91 Va. L. Rev. 677, 679–81, 695–99 (2005) (explaining the Court's "conceptual confusion over the meaning of proportionality"); Wayne A. Logan, *Proportionality and Punishment: Imposing Life Without Parole on Juveniles*, 33 Wake Forest L. Rev. 681, 693–706 (1998) (tracking evolution of proportionality principle in Supreme Court cases involving life-without-parole sentences).

The Court has recognized its difficulties in the area, noting in *Lockyer v. Andrade*, 538 U.S. 63, 72, 123 S. Ct. 1166, 1173, 155 L. Ed. 2d 144, 155 (2003), that "we have not established a clear or consistent path for courts to follow." Nonetheless, regardless of controversies over the degree of deference to legislative bodies or the number of prongs in a proper test, there can be little doubt proportionality analysis is integral to Eighth Amendment analysis.

In determining whether a criminal penalty amounts to an Eighth Amendment violation, the Supreme Court looks to contemporary norms, or, in the court's phraseology, from "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 598, 2 L. Ed. 2d 630, 642 (1958) (plurality opinion); *accord Miller*, 567 U.S. at ___, 132 S. Ct. at 2463, 183 L. Ed. 2d at 417; *Graham*, 560 U.S. at ___, 130 S. Ct. at 2021, 176 L. Ed. 2d at 835; *Kennedy v. Louisiana*, 554 U.S. 407, 419, 128 S. Ct. 2641, 2649, 171 L. Ed. 2d 525, 538, *opinion modified on denial of reh'g*, 554 U.S. 945, 129 S. Ct. 1, 171 L. Ed. 2d 932 (2008); *Roper*, 543 U.S. at 560–61, 125 S. Ct. at 1190, 161 L. Ed. 2d at 16; *Stanford v. Kentucky*, 492 U.S. 361, 369–70, 109 S. Ct. 2969, 2974–75, 106 L. Ed. 2d 306, 317–18 (1989), *abrogated on other grounds by Roper*, 543 U.S. at 574, 125 S. Ct. at 1198, 161 L. Ed. 2d at 25; *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251, 259 (1976). Although some justices have disagreed with this interpretation, *see Ewing*, 538 U.S. at 31–32, 123 S. Ct. at 1190–91, 155 L. Ed. 2d at 124 (Scalia, J., concurring), the Supreme Court has thus repeatedly rejected a narrow originalist or historical approach to the Eighth Amendment. As was noted by Justice O'Connor in *Roper*,

It is by now beyond serious dispute that the Eighth Amendment's prohibition of "cruel and unusual

punishments" is not a static command. Its mandate would be little more than a dead letter today if it barred only those sanctions—like the execution of children under the age of seven—that civilized society had already repudiated in 1791.

543 U.S. at 589, 125 S. Ct. at 1206–07, 161 L. Ed. 2d at 39 (O'Connor, J., dissenting).

Finally, it is clear that the Eighth Amendment is designed to curb legislative excesses. Its very function is, at the margins, to prevent the majoritarian branches of government from overreaching and enacting overly harsh punishments. As the Court noted in *Trop,* "We cannot push back the limits of the Constitution merely to accommodate challenged legislation." 356 U.S. at 104, 78 S. Ct. at 600, 2 L. Ed. 2d at 644. If the Eighth Amendment was not judicially enforceable, it would amount to " 'little more than good advice.' " *Furman v. Georgia,* 408 U.S. 238, 269, 92 S. Ct. 2726, 2742, 33 L. Ed. 2d 346, 366 (1972) (Brennan, J., concurring) (quoting *Trop,* 356 U.S. at 104, 78 S. Ct. at 599, 2 L. Ed. 2d at 644). As noted by Justice Powell, "[O]ur system of justice always has recognized that appellate courts *do* have a responsibility—expressed in the proportionality principle—not to shut their eyes to grossly disproportionate sentences that are manifestly unjust." *Hutto v. Davis,* 454 U.S. 370, 377, 102 S. Ct. 703, 707, 70 L. Ed. 2d 556, 562 (1982) (Powell, J., concurring). While the power of judicial review does not mean that we should blue pencil every sentence, we do have a constitutional obligation to ensure sentences remain within constitutional boundaries. In engaging in the determination of whether a sentence is cruel or unusual, the United States Supreme Court has recognized that, at the end of the day, a court must exercise its independent judgment. *Graham,* 560 U.S. at ___, ___, 130 S. Ct. at 2022, 2026, 176 L. Ed. 2d at 837, 841; *Kennedy,* 554 U.S. at 421, 128 S. Ct. at

2650–51, 171 L. Ed. 2d at 539–40; *Roper*, 543 U.S. at 564, 125 S. Ct. at 1192, 161 L. Ed. 2d at 18.

2. *Death penalty jurisprudence: death is different.* Alongside its gross proportionality cases, the Supreme Court also developed Eighth Amendment doctrine in the context of the death penalty. After struggling with the issue of whether the death penalty could ever be imposed, *see, e.g., Gregg v. Georgia*, 428 U.S. 153, 176–87, 96 S. Ct. 2909, 2926–32, 49 L. Ed. 2d 859, 876–83 (1976) (plurality opinion); *Furman*, 408 U.S. at 239–40, 92 S. Ct. at 2727, 33 L. Ed. 2d at 350 (per curiam), the Court ultimately settled on two approaches to death penalty cases—a categorical approach and an individualized approach.

First, the Supreme Court has taken a categorical approach in which it has determined the Cruel and Unusual Punishments Clause prohibits the death penalty in certain classes of cases or for particular types of offenders. For example, in *Coker v. Georgia*, 433 U.S. 584, 600, 97 S. Ct. 2861, 2870, 53 L. Ed. 2d 982, 994 (1977) (plurality opinion), although no one line of reasoning commanded a majority, the Court concluded the death penalty could not be imposed for the rape of an adult woman. Similarly, in *Enmund v. Florida*, 458 U.S. 782, 798, 102 S. Ct. 3368, 3377, 73 L. Ed. 2d 1140, 1152 (1982), the Court held the death penalty could not be imposed upon a person who did not take a life, attempt to take a life, or intend to take a life even though he had been convicted of first-degree murder under the felony-murder rule.

The Court has also prohibited the death penalty for particular classes of offenders. For example, in *Thompson v. Oklahoma*, 487 U.S. 815, 838, 108 S. Ct. 2687, 2700, 101 L. Ed. 2d 702, 720–21 (1988) (plurality opinion), a plurality of the Court held contemporary standards of decency categorically prohibited the death penalty for offenders under

the age of sixteen at the time of the crime. Two years later, however, a divided Supreme Court in *Stanford* rejected the claim that capital punishment could never be imposed on juveniles over the age of sixteen, but under the age of eighteen. 492 U.S. at 380, 109 S. Ct. at 2980, 106 L. Ed. 2d at 325. On the same day as *Stanford,* the Supreme Court decided *Penry v. Lynaugh,* 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989). In *Penry,* the Court held the Eighth Amendment did not categorically bar the death penalty against mentally retarded defendants. *Id.* at 340, 109 S. Ct. at 2958, 106 L. Ed. 2d at 292. Thirteen years later, however, the Supreme Court reversed course and held that the death penalty categorically could not be imposed on the mentally retarded. *Atkins v. Virginia,* 536 U.S. 304, 321, 122 S. Ct. 2242, 2252, 153 L. Ed. 2d 335, 350 (2002).

With respect to cases that did not trigger a categorical approach, the Supreme Court developed a requirement of a careful, individualized determination prior to imposition of the death penalty. In *Woodson v. North Carolina,* 428 U.S. 280, 303–04, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944, 960–61 (1976) (plurality opinion), a plurality required that sentencing authorities consider the characteristics of the offender and the details of the offense, including any mitigating factors, before imposing a death sentence. The Court elaborated further on the contours of individualized sentencing in subsequent cases. *See, e.g., Johnson,* 509 U.S. at 367–68, 113 S. Ct. at 2668–69, 125 L. Ed. 2d at 305–07; *Sumner v. Shuman,* 483 U.S. 66, 73–76, 107 S. Ct. 2716, 2721–23, 97 L. Ed. 2d 56, 64–66 (1987); *Eddings,* 455 U.S. at 110–12, 102 S. Ct. at 874–75, 71 L. Ed. 2d at 8–9; *Lockett v. Ohio,* 438 U.S. 586, 604–05, 98 S. Ct. 2954, 2965, 57 L. Ed. 2d 973, 990 (1978) (plurality opinion). According to the Court,

"[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

*Eddings*, 455 U.S. at 110, 102 S. Ct. at 874, 71 L. Ed. 2d at 8 (quoting *Lockett*, 438 U.S. at 604, 98 S. Ct. at 2964–65, 57 L. Ed. 2d at 990 (footnotes omitted)).

**D. Application of Cruel and Unusual Punishment Concepts to Juvenile Offenders Under the Eighth Amendment.**

1. *Introduction.* For many years, the Supreme Court has recognized the difference between adults and juveniles. For example, in *Haley v. Ohio*, 332 U.S. 596, 599, 68 S. Ct. 302, 304, 92 L. Ed. 224, 228 (1948) (plurality opinion), four justices emphasized that courts should take "special care" in considering a confession obtained from a juvenile due to the "great instability which the crisis of adolescence produces." The Court took a similar approach in *Gallegos v. Colorado*, 370 U.S. 49, 54, 82 S. Ct. 1209, 1212–13, 8 L. Ed. 2d 325, 329 (1962), where it declared a juvenile "cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions." In *Bellotti v. Baird*, 443 U.S. 622, 635, 99 S. Ct. 3035, 3044, 61 L. Ed. 2d 797, 808 (1979), the Court noted that "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them."

In *Eddings*, the Court recognized that "youth is more than a chronological fact" because "[i]t is a time and condition of life when a person may be most susceptible to influence and to psychological damage." 455 U.S. at 115, 102 S. Ct. at 877, 71 L. Ed. 2d at 11. Elaborating, the Court noted that youth, "particularly in the early and

middle teen years, are more vulnerable, more impulsive, and less self-disciplined than adults." *Id.* at 115 n.11, 102 S. Ct. at 877 n.11, 71 L. Ed. 2d at 11 n.11 (citation and internal quotation marks omitted). Thus, adolescents "deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults." *Id.*

Finally, in *Johnson*, the Court noted the "lack of maturity and an underdeveloped sense of responsibility" of youths "often result in impetuous and ill-considered actions and decisions." 509 U.S. at 367, 113 S. Ct. at 2668–69, 125 L. Ed. 2d at 306. The Court required a sentence to consider "youth as a mitigating factor" because "the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Id.* at 368, 113 S. Ct. at 2669, 125 L. Ed. 2d at 306–07.

While the special features of adolescence have long been recognized in the Court's jurisprudence, the unique features of youth came into focus in *Roper*, *Graham*, and *Miller*. These three cruel and unusual punishment cases have worked a major change in the Court's approach to juvenile justice.

2. Roper*: Recognition of constitutionally significant differences between juveniles and adults through law and science in the death penalty context.* The first case of the recent juvenile sentencing trilogy is *Roper*. There, the Supreme Court granted certiorari to review the striking decision of the Supreme Court of Missouri that *Stanford* was no longer good law because of an evolving national consensus against the imposition of the death penalty on juveniles. *Roper*, 543 U.S. at 559–60, 125 S. Ct. at 1189–90, 161 L. Ed. 2d at 15; *see also State ex rel. Simmons v. Roper*, 112 S.W.3d 397, 399, 413 (Mo. 2003) (en banc).

The Supreme Court affirmed. *Roper*, 543 U.S. at 578–79, 125 S. Ct. at 1200, 161 L. Ed. 2d at 28. In an important opinion by Justice Kennedy, the Court first noted a distinct trend in the states away from imposing the death penalty on juveniles. *Id.* at 564–68, 125 S. Ct. at 1192–94, 161 L. Ed. 2d at 18–21. Further, the Court emphasized that the Eighth Amendment applies "with special force" to death penalty cases. *Id.* at 568, 125 S. Ct. at 1194, 161 L. Ed. 2d at 21.

The Court next recognized three important differences between youth under the age of eighteen and adults, all of which had been noted in prior cases. First, the Court relied upon *Johnson*'s recognition that youths' lack of maturity and underdeveloped sense of responsibility often combine to result in impulsive decision making and, in turn, reckless behavior. *Id.* at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 21 (citing *Johnson*, 509 U.S. at 367, 113 S. Ct. at 2668–69, 125 L. Ed. 2d at 306); *see also Eddings*, 455 U.S. at 116, 102 S. Ct. at 877, 71 L. Ed. 2d at 12 ("Even the normal 16-year-old customarily lacks the maturity of an adult."). Second, the Court noted youth "are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Roper*, 543 U.S. at 569, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22 (citing *Eddings*, 455 U.S. at 115–16, 102 S. Ct. at 877, 71 L. Ed. 2d at 11–12). Third, the Court noted that "the character of a juvenile is not as well formed as that of an adult." *Id.* at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22; *see also Johnson*, 509 U.S. at 368, 113 S. Ct. at 2669, 125 L. Ed. 2d at 306.

In addition to citing the recognitions of its precedents, the Court relied upon recent scientific advances shedding light on the reasons underlying the differences between youth and adults. In particular, the Court, relying upon the work of Scott and Steinberg, noted that

"juveniles have less control, or less experience with control, over their own environment" and that risky and antisocial behavior often end as a teenager matures, which leads to the conclusion that "only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood." *Roper*, 543 U.S. at 569–70, 125 S. Ct. at 1195–96, 161 L. Ed. 2d at 22 (citation and internal quotation marks omitted). The Court further relied on Scott and Steinberg for the proposition that "[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption." *Id.* at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24. Finally, the Court indicated that because this difficulty underlies the rule forbidding psychiatrists from diagnosing any patient under the age of eighteen with antisocial personality disorder, states should similarly refrain from asking jurors to impose the death penalty. *Id.* Based on these scientific revelations, the Court found that, like the mentally retarded in *Atkins*, juveniles were less culpable for their offenses than adults and that the death penalty was less likely to have a deterrent effect. *Id.* at 571–73, 125 S. Ct. at 1196–97, 161 L. Ed. 2d at 23–24.

The Court concluded a categorical prohibition was necessary because "[t]he differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability." *Id.* at 572–73, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24. The Court continued, "An unacceptable likelihood exists that the brutality or cold-blooded nature of the crime would overpower mitigating arguments based on youth as a matter of course . . . ." *Id.* at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24. In

addition, the Court noted, with some prescience, that some prosecutors may even use youth as an aggravating, rather than mitigating, factor. *Id.* To avoid these difficulties, the Court adopted a categorical rule prohibiting the imposition of the death penalty for crimes committed by persons under eighteen years of age. *Id.* at 578–79, 125 S. Ct. at 1200, 161 L. Ed. 2d at 28.

The Court concluded with the observation that the United States was the only country in the world that officially sanctioned the juvenile death penalty. *Id.* at 575, 125 S. Ct. at 1198, 161 L. Ed. 2d at 25. Although it acknowledged that international norms were not controlling, the Court recognized that the laws of other countries and international authorities have often been regarded as instructive in Eighth Amendment interpretation. *Id.* at 575–76, 125 S. Ct. at 1198–99, 161 L. Ed. 2d at 25–26. According to the Court, international consensus against the death penalty for juveniles rested in large part "on the understanding that the instability and emotional imbalance of young people may often be a factor in the crime." *Id.* at 578, 125 S. Ct. at 1200, 161 L. Ed. 2d at 27.

To sum up, in *Roper* the Court recognized that juveniles have lessened culpability than adults because juveniles have immature judgment, are more susceptible to negative peer and environmental influences, and have transitional identities in comparison with their fully biologically developed adult counterparts. *See* Barry C. Feld, *A Slower Form of Death: Implications of* Roper v. Simmons *for Juveniles Sentences to Life Without Parole*, 22 Notre Dame J.L. Ethics & Pub. Pol'y 9, 26–43 (2008) (reviewing the developmental psychological research that bolstered the Supreme Court's conclusion in *Roper*). *Roper* broke new ground regarding the application of the Eighth Amendment against juvenile

offenders. When the decision was rendered, seventy-three juveniles faced execution in the United States. Clayton A. Hartjen, *Youth, Crime & Justice: A Global Inquiry* 121 (2008). In addition to directly affecting these youths, however, there was a substantial question whether the approach in *Roper* would extend to contexts other than the death penalty where incarcerated juveniles claimed their imprisonment amounted to cruel and unusual punishment in violation of the Eighth Amendment. In other words, was *Roper* simply a death penalty case, which rested on the slogan "death is different," or did *Roper* have wider implications for cruel and unusual punishment cases involving juveniles?

3. Graham*: A constitutionally required "second look" for nonhomicide juvenile offenders sentenced to life in prison without parole.* The wider view of *Roper* was vindicated when the Supreme Court decided *Graham* just five years later. In *Graham*, the Court considered whether life without parole could be imposed against a juvenile defendant for a nonhomicide offense. 560 U.S. at ___, 130 S. Ct. at 2017–18, 176 L. Ed. 2d at 832. The Court's answer: No. *Id.* at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845.

The Court first concluded there was a developing national consensus against life-without-parole sentences for juveniles convicted of nonhomicide offenses. *Id.* at ___, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841. The Court next moved to exercise its independent judgment regarding the sanction. As in *Roper*, the Court cited developments in psychology and neuroscience that continued to show fundamental differences between juvenile and adult brains, such as that "the parts of the brain involved in behavior control continue to mature through late adolescence." *Id.* at ___, 130 S. Ct. at 2026–27, 176 L. Ed. 2d at 841–42. As a result, the Court noted the actions of juveniles were less likely to

reflect an " 'irretrievably depraved character' " than are actions by an adult. *Id.* at ___, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841 (quoting *Roper*, 543 U.S. at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22).

Again relying on the differences between juveniles and adults, the Court concluded the penological justifications of life-without-parole sentences were undermined. *Id.* at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845. With respect to retribution, the Court noted that a juvenile nonhomicide offender was less culpable than other offenders. *Id.* at ___, 130 S. Ct. at 2028, 176 L. Ed. 2d at 843–44. The Court concluded deterrence has less validity because of the "impetuous and ill-considered" nature of juvenile decision making. *Id.* at ___, 130 S. Ct. at 2028–29, 176 L. Ed. 2d at 844 (citation and internal quotation marks omitted). The Court dismissed incapacitation as a justification for the punishment based on *Roper*'s doubt that sentencers can "make a judgment that the juvenile is incorrigible" when it is difficult for expert psychologists to make such a determination. *Id.* at ___, 130 S. Ct. at 2029, 176 L. Ed. 2d at 844. Of particular note, the Supreme Court pointed to a state court, which had concluded that " 'incorrigibility is inconsistent with youth.' " *Id.* (quoting *Workman v. Commonwealth*, 429 S.W.2d 374, 378 (Ky. 1968)). Finally, the Court concluded a sentence of life without parole can never be justified on rehabilitation grounds because the offender, by definition, will never be released into society. *Id.* at ___, 130 S. Ct. at 2029–30, 176 L. Ed. 2d at 845.

In evaluating whether to categorically prohibit the sentence, the Court concluded a case-by-case approach was undesirable because such an approach would not "with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change" or account for the "special difficulties encountered by counsel"

in representing juveniles. *Id.* at ___, 130 S. Ct. at 2032, 176 L. Ed. 2d at 847–48. Such difficulties, including juveniles' mistrust of adults, impulsiveness, limited understanding of the criminal justice system, and lessened likelihood working effectively with their lawyers, put juveniles "at a significant disadvantage in criminal proceedings" as compared to adults. *Id.* at ___, 130 S. Ct. at 2032, 176 L. Ed. 2d at 848. In addition, the Court noted a categorical rule ensured all juvenile nonhomicide offenders a chance to demonstrate maturity and reform. *Id.* Finally, the Court, as in *Roper,* surveyed international law and found that the practice of sentencing juveniles to life in prison without parole for nonhomicide offenses was rejected the world over. *Id.* at ___, 130 S. Ct. at 2033–34, 176 L. Ed. 2d at 848–49.

In categorically prohibiting life without parole for a juvenile who does not commit a homicide offense, the Court was careful to point out the Eighth Amendment requires only "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Id.* at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46. The Eighth Amendment does not, according to the Court, require release. *Id.* at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 846. Thus, the Court noted a key distinction between the opportunity for parole and the complete forswearing of that opportunity altogether.

4. Miller*: differences between juveniles and adults prohibit mandatory life in prison without parole for homicide offenders.* As was the case after *Roper,* the question after *Graham* was whether the rationale in *Graham* should be limited to its factual setting of nonhomicide crimes or whether it would have broader implications. In *Miller,* the Supreme Court considered two cases in which fourteen-year-old criminal defendants received sentences of life in prison without parole following

murder convictions. 567 U.S. at ___, 132 S. Ct. at 2460, 183 L. Ed. 2d at 414. In order to explore *Miller*, we begin with a brief survey of the facts of each case and then examine how the Supreme Court resolved the legal issues.

The first case considered in *Miller* was that of Kuntrell Jackson. Jackson came from a family life of violence. *Id.* at ___, 132 S. Ct. at 2468, 183 L. Ed. 2d at 423. Both his mother and grandmother had previously shot other individuals. *Id.* Prior to the incident giving rise to his life-without-parole sentence, Jackson had been arrested for shoplifting and several incidents of car theft. *Id.* at ___, 132 S. Ct. at 2461, 183 L. Ed. 2d at 415.

When he was fourteen, Jackson and two other boys decided to rob a video store. *Id.* One of the boys carried a sawed off shotgun concealed under his coat. *Id.* At first, Jackson refused to enter the store, but later changed his mind while the robbery was in progress. *Id.* After he entered the store, Jackson apparently made a comment, either addressing the clerk stating, "[w]e ain't playin," or addressing his comrades stating, "I thought you all was playin'." *Id.* (internal quotation marks omitted). While Jackson was inside the store, the boy with the shotgun shot and killed a store clerk who threatened to call police. *Id.* The boys fled the scene empty-handed. *Id.*

The State of Arkansas charged Jackson with capital felony murder and aggravated robbery. *Id.* The district court refused to transfer his case to juvenile court. *Id.* After the jury convicted Jackson, the district court sentenced him to life in prison without parole, the statutory minimum sentence. *Id.*

The other case concerned Evan Miller, who was also fourteen at the time of his crime. *Id.* ___, 132 S. Ct. at 2462, 183 L. Ed. 2d at 416.

Miller had been in and out of foster care because his drug-addicted, alcoholic mother neglected him and his stepfather abused him. *Id.* at ___, ___, 132 S. Ct. at 2462, 2469, 183 L. Ed. 2d at 416, 423. Miller regularly used drugs and alcohol and had attempted suicide four times beginning when he was six years old. *Id.* at ___, 132 S. Ct. at 2462, 183 L. Ed. 2d at 416. His prior criminal record, however, was limited to just two instances of truancy and one of second-degree criminal mischief. *Id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 423–24.

Miller was at home with a friend when a neighbor arrived to make a drug deal with Miller's mother. *Id.* at ___, 132 S. Ct. at 2462, 183 L. Ed. 2d at 416. After the drug deal, the boys followed the neighbor home to his trailer, where the three smoked marijuana and drank alcohol. *Id.* After the neighbor passed out, Miller and his friend proceeded to rob him of his wallet. *Id.* When the neighbor unexpectedly awoke, a fight ensued and Miller repeatedly struck the neighbor with a baseball bat. *Id.* Toward the end of the struggle, Miller placed a sheet over the neighbor's head and told him, "I am God, I've come to take your life." *Id.* He then delivered one more blow. *Id.* Miller and his friend left the trailer, but later decided to cover up evidence of the crime by burning it down. *Id.* The neighbor died from his injuries and smoke inhalation. *Id.*

Miller was originally charged as a juvenile, but his case was transferred to adult court. *Id.* at ___, 132 S. Ct. at 2462, 183 L. Ed. 2d at 416–17. The State of Alabama charged Miller with murder in the course of arson. *Id.* at ___, 132 S. Ct. at 2462–63, 183 L. Ed. 2d at 417. After a jury found Miller guilty, he was sentenced to the mandatory minimum sentence of life without parole. *Id.*

In an opinion by Justice Kagan, the Court canvassed its recent precedents. The case implicated two strands of the Court's precedent

under the Cruel and Unusual Punishments Clause.  *Id.* at \_\_\_, 132 S. Ct. at 2463, 183 L. Ed. 2d at 417.  The first strand involved categorical bans as in *Roper*, *Graham*, and *Atkins*, where the Court found a mismatch between the culpability of the offender and the severity of the penalty. *Id.*  The second strand, individualized sentencing cases such as *Woodson* and *Lockett*, prohibited mandatory imposition of capital punishment without consideration of the characteristics of the defendant and the details of the offense.  *Id.* at \_\_\_, 132 S. Ct. at 2463–64, 183 L. Ed. 2d at 417–18.

The Court reiterated the distinctive characteristics of juveniles identified in *Roper* and *Graham*—the lack of maturity, the vulnerability to peer pressure, and the lack of a well-formed character—as well as the underpinnings provided by science, social science, and common sense ("on what 'any parent knows' "), "diminish penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes."  *Id.* at \_\_\_, 132 S. Ct. at 2464–65, 183 L. Ed. 2d at 418–20.  It then determined these considerations applied with equal force when a juvenile was convicted of homicide:

> To be sure, *Graham*'s flat ban on life without parole applied only to nonhomicide crimes, and the Court took care to distinguish those offenses from murder, based on both moral culpability and consequential harm.  But none of what it said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific.

*Id.* at \_\_\_, 132 S. Ct. at 2465, 183 L. Ed. 2d at 420 (citation omitted).  In other words, the Court considered whether the rationale of *Roper* and *Graham* was limited by their factual settings and concluded it was not. According to the Court, *Roper* and *Graham* establish "that children are

constitutionally different from adults for sentencing purposes." *Id.* at
___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418.[4]

The Court, however, found it unnecessary to decide whether to
impose a categorical ban on life in prison without parole for juveniles,
choosing instead to take a narrow route. The Court drew upon *Graham*'s
comparison of a life-without-parole sentence for a juvenile to the death
penalty, a penalty "reserved only for the most culpable defendants
committing the most serious offenses." *Id.* at ___, 132 S. Ct. at 2466–67,
183 L. Ed. 2d at 421; *see also Graham*, 560 U.S. at ___, 130 S. Ct. at
2027, 176 L. Ed. 2d at 842–43. It also drew upon the reasoning of
*Woodson* and its progeny that a mandatory scheme imposing the death
penalty was flawed because it did not take into account "the possibility of
compassionate or mitigating factors." *Miller*, 567 U.S. at ___, 132 S. Ct.
at 2467, 183 L. Ed. 2d at 421 (internal quotation marks omitted). The
Court cited *Johnson* and *Eddings*, pre-*Roper* death penalty cases, where
it had emphasized the need to consider the youthful characteristics of
juvenile defendants. *Id.* at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 422;
*see also Johnson*, 509 U.S. at 367, 113 S. Ct. at 2668–69, 125 L. Ed. 2d
at 306; *Eddings*, 455 U.S. at 115–16, 102 S. Ct. at 877, 71 L. Ed. 2d at
11–12. Reasoning by analogy of the pre-*Roper* individualized sentencing
cases, *Roper*, and *Graham*, the Court concluded life without parole could
not be imposed on a juvenile for a homicide offense without an

---

[4]The Supreme Court in *Miller* did not expressly cite to peer-reviewed studies in
reaching its conclusion, but citing the briefs of amici, noted "the science and social
science supporting *Roper*'s and *Graham*'s conclusions have become even stronger."
*Miller v. Alabama*, 567 U.S. ___, ___ n.5, 132 S. Ct. 2455, 2464 n.5, 183 L. Ed. 2d 407,
419 n.5 (2012). Those briefs are chock-full of peer-reviewed studies. *See generally*
Brief for the Am. Psychological Ass'n, Am. Psychiatric Ass'n & Nat'l Ass'n of Social
Workers as Amici Curiae in Support of Petitioners, at 7–31, *Miller*, 567 U.S. ___; Brief
for Am. Med. Ass'n and Am. Acad. of Child & Adolescent Psychiatry as Amici Curiae in
Support of Neither Party, at 5–36, *Miller*, 567 U.S. ___; Brief of J. Lawrence Aber, et al.
as Amici Curiae in Support of Petitioners, at 14–36, *Miller*, 567 U.S. ___.

individualized consideration of the appropriateness of the sentence in light of the nature of the crime and the characteristics of the juvenile offender. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2468–69, 183 L. Ed. 2d at 422–24.

As a result, the Court did not consider the alternative argument that the Eighth Amendment categorically bans life without parole for juveniles. *Id.* at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. But the Court did not simply leave matters there. It stated that in light of the teaching of *Roper*, *Graham*, and the *Miller* case itself, "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* The Court held this belief in light of the difficulty of "distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption,' " as well as a requirement that a sentencer "take into account how children are different, and how those differences counsel *against* irrevocably sentencing them to a lifetime in prison." *Id.* (emphasis added) (quoting *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24).

5. *Implications of the* Roper–Graham–Miller *trilogy.* *Roper*, *Graham*, and *Miller* directly settled a number of controversies. After these cases, it is clear that the Eighth Amendment prohibits the imposition of the death penalty for crimes committed by juvenile defendants, that life in prison without parole cannot be imposed on a juvenile nonhomicide offender, and that mandatory life without parole cannot be imposed on a juvenile who commits homicide without consideration of the mitigating characteristics of youth. All of these results rested on the notion that juveniles are constitutionally different from adults for purposes of the imposition of harsh punishments.

One of the questions not answered in *Miller* is whether life without parole can ever be imposed for crimes committed by a juvenile. The notion that the Eighth Amendment provides a categorical ban to life-without-parole sentences for juveniles even in homicide cases was urged by the American Bar Association based on its decades-long involvement in juvenile and criminal justice matters. Brief of ABA as Amicus Curiae in Support of Petitioners, at 6–7, *Miller*, 567 U.S. ___. The Supreme Court fell just short of a categorical ban in *Miller*, content to declare that to the extent such sentences could constitutionally be imposed, such cases would be rare or "uncommon." 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424. Whether the Supreme Court will ultimately foreclose the possibility of life-without-parole sentences for juveniles will have to await further caselaw.

Neither *Roper, Graham,* nor *Miller* involved a sentence for a lengthy term of years that was not life without parole. Some commentators emphasize that *Graham*'s conclusion that the Eighth Amendment requires "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," 560 U.S. at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46, is inconsistent with long mandatory sentences. *See, e.g.,* Cara H. Drinan, Graham *on the Ground*, 87 Wash. L. Rev. 51, 54, 62–63 (2012); Leslie Patrice Wallace, *"And I Don't Know Why It Is That You Threw Your Life Away": Abolishing Life Without Parole, the Supreme Court in* Graham v. Florida *Now Requires States to Give Juveniles Hope for a Second Chance,* 20 B.U. Pub. Int. L.J. 35, 53–64 (2010) [hereinafter Wallace].

*Miller* also does not expressly address to what extent a mandatory minimum sentence for adult crimes can automatically be imposed on a juvenile tried as an adult without allowing the juvenile to seek a lesser

sentence based on the reasoning of *Roper, Graham,* and *Miller.* The notion that the reasoning of *Roper* was limited to the death penalty cases was proven wrong in *Graham,* and the notion that *Graham*'s reasoning was limited to nonhomicide cases was proven wrong in *Miller.* Further, the Supreme Court in *Miller* specifically declared that what it said about juveniles in *Roper, Graham,* and *Miller* is not "crime-specific." *Miller,* 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 420. As a result, it can be argued that the diminished culpability of juveniles must always be a factor considered in criminal sentencing. *See, e.g.,* Feld, 10 J.L. & Fam. Stud. at 62, 70–76 (arguing that "no principled bases exist by which to distinguish the diminished responsibility that bars the death penalty from adolescents equally reduced culpability that warrants shorter sentences for all serious crimes" and calling for a categorical "youth discount" in sentencing); Martin Guggenheim, Graham v. Florida *and a Juvenile's Right to Age-Appropriate Sentencing,* 47 Harv. C.R.-C.L. L. Rev. 457, 489–93 (2012) (arguing juveniles may never be automatically sentenced to generally applicable mandatory minimums); Emily C. Keller, *Constitutional Sentences for Juveniles Convicted of Felony Murder in the Wake of* Roper*,* Graham & J.D.B., 11 Conn. Pub. Int. L.J. 297, 322 (2012) (arguing mandatory adult sentences deprive trial courts of their discretion to consider mitigating factors); Tanenhaus & Drizin, 92 J. Crim. L. & Criminology at 697–98 (calling for a "youth exception to . . . one size fits all sentences"); *see also* Wallace, 20 B.U. Pub. Int. L.J. at 71 (calling for legislation requiring periodic reviews of juvenile sentences even where they are sentenced to a generally applicable mandatory minimum). Following this view, the State of Washington has abolished imposing mandatory adult sentences on juveniles convicted in adult court. *See* Wash. Rev. Code Ann. § 9.94A.540 (West, Westlaw current

with 2013 Legislation eff. through Aug. 1, 2013). Yet, an argument can be made that *Roper, Graham,* and *Miller,* despite their protean rationales, should be limited to the specific factual settings of the cases themselves and not used as a source of law in other contexts.

In any event, it is unclear what the Supreme Court precisely meant in *Graham* by requiring the state to provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." 560 U.S. at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46. It did not indicate when such an opportunity must be provided or provide guidance regarding the nature or structure of such a second-look or back-end opportunity.[5] Instead, the Court left it to the states "to explore the means and mechanisms for compliance." *Id.* at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 846.

### E. Developments in State Constitutional Law.

1. *Cruel and unusual punishment development in other states.* Nearly all state constitutions have a provision limiting the scope of punishments that may be imposed on criminal defendants. Richard S. Frase, *Limiting Excessive Prison Sentences Under Federal and State Constitutions,* 11 U. Pa. J. Const. L. 39, 64–65 (2008) [hereinafter Frase].

---

[5]The American Academy of Child and Adolescent Psychiatry (AACAP), which filed amicus briefs in *Roper, Graham,* and *Miller* pointing out biological differences between juvenile and adult brains, has urged that juveniles serving life-without-parole sentences receive an initial sentencing review within five years or by the age of twenty-five, whichever occurs first. Am. Acad. of Child & Adolescent Psychiatry, *Policy Statement: Juvenile Life Without Parole: Review of Sentences* (April 2011), *available at* http://www.aacap.org/cs/root/policy_statements/juvenile_life_without_parole_review_ of_sentences. Such a sentence review, according to the AACAP, must include "a review of educational and court documents as well as a comprehensive mental health evaluation, conducted by a child mental health professional." *Id.*; *see also* Gerard Glynn & Ilona Vila, *What States Should Do To Provide a Meaningful Opportunity for Review and Release: Recognize Human Worth and Potential,* 24 St. Thomas L. Rev. 310, 323 (2012).

Many of them are worded differently in material ways from the Eighth Amendment, while others are closely parallel. *Id.*; *accord* 2 Jennifer Friesen, *State Constitutional Law: Litigating Individual Rights, Claims and Defenses* § 13.02[2], at 13–4 to 13–5 (4th ed. 2006) [hereinafter Friesen].

Unlike other areas of law such as search and seizure, where there are hundreds of state law cases that substantially depart from federal interpretations of the Fourth Amendment, there has not been a large body of independent state constitutional law in the area of cruel and unusual punishment. Frase, 11 U. Pa. J. Const. L. at 63–64. There are, however, a few cases in which state courts have been in the vanguard. *Id.* at 67–69.

For example, in *Workman* the Kentucky Court of Appeals, then the highest court in the state, held a sentence of life without parole imposed upon a fourteen-year-old rape offender violated the Kentucky Constitution. 429 S.W.2d at 378. The *Workman* majority noted juveniles are deprived of many benefits of the law because of their immaturity and concluded that because life imprisonment without parole is designed for "dangerous and incorrigible individuals who would be a constant threat to society," such judgments were "inconsistent with youth." *Id.* at 377–78. The United States Supreme Court cited *Workman* forty-two years later in *Graham.* 560 U.S. at ___, 130 S. Ct. at 2029, 176 L. Ed. 2d at 844. Twenty years before *Graham,* the Supreme Court of Nevada in *Naovarath v. State,* 779 P.2d 944, 944, 948–49 (Nev. 1989), held a sentence of life in prison without parole for a thirteen year old who pled guilty to murder was cruel and unusual under both the Nevada and Federal Constitutions. The Nevada court observed, "We may possibly have in the child before us the beginning of an irremediably dangerous adult human being, but we certainly cannot know that fact with any

degree of certainty *now.*" *Id.* at 947. Finally, in *People v. Miller*, 781 N.E.2d 300, 308–10 (Ill. 2002), the Supreme Court of Illinois concluded a mandatory life-without-parole sentence for a fifteen year old who was convicted of two counts of first-degree murder, but who only acted as a lookout, enlisted to help the triggerman at the last minute, violated the Illinois Constitution and "shock[ed] the moral sense of the community." These juvenile cases in state courts set the stage for later development on similar issues by the United States Supreme Court.

With respect to generally applicable proportionality tests, most states employ them, though some have yet to develop a standard independent of that articulated by the United States Supreme Court in *Solem.* 2 Friesen at § 13.04[1][b], at 13–35 to 13–40; *see, e.g., People v. Bullock*, 485 N.W.2d 866, 875 (Mich. 1992) (adopting *Solem* factors under the Michigan Constitution, but applying them in a fashion to reject the result of *Harmelin*). *But see State v. Stirens*, 506 N.W.2d 302, 305 (Minn. 1993) (stating cruel or unusual punishments clause of the Minnesota Constitution has not been held to guaranty proportionality of sentencing). Others employ more flexible approaches, such as a shock-the-conscience test. 2 Friesen at § 13.04[1][b], at 13–39 & n.190; *see, e.g., Miller*, 781 N.E.2d at 307 (employing a "shock the moral sense of the community" test as one form of proportionality review under the Illinois Constitution); *State v. Glover*, 355 S.E.2d 631, 639 (W. Va. 1987) (employing a shock-the-conscience test prior to any proportionality analysis).

When it comes to post-*Miller* cases involving challenges to penalties imposed on juveniles, there has been little development of state constitutional law. Most recent state court decisions have claimed to follow the *Roper–Graham–Miller* framework under their state

constitutions. For instance, in *Commonwealth v. Batts*, 66 A.3d 286, 299 (Pa. 2013), the Supreme Court of Pennsylvania concluded the Pennsylvania Constitution, which contains a clause prohibiting "cruel punishments," did not provide the basis for a different approach under the facts of the case. *See also People v. Taylor*, No. 4–11–0926, 2013 WL 164909, at ¶¶ 45, 49 (Ill. App. Ct. Jan. 9, 2013) (unpublished opinion) (finding the sentencing court considered the juvenile's age under the Eighth Amendment and the proportionate-penalties clause of the Illinois Constitution); *People v. Eliason,* 833 N.W.2d 357, 374, (Mich. Ct. App. 2013) (Gleicher, P.J., concurring in part and dissenting in part) (finding a sentence to be in violation of the United States and Illinois Constitution utilizing *Graham* and *Miller* principles).

2. *Cruel and unusual punishment under the Iowa Constitution.* Article I, section 17 of the Iowa Constitution, in a similar manner to its federal counterpart, provides that "cruel and unusual punishment shall not be inflicted." Defendants generally have not suggested any distinction between the analysis applicable to the state clause and the federal clause. *See State v. Musser*, 721 N.W.2d 734, 748 n.8 (Iowa 2006); *In re Det. of Garren,* 620 N.W.2d 275, 280 n.1 (Iowa 2000). As a result, the potential development of an independent path in the area of cruel and unusual punishment has been limited by the nature of the advocacy.

In *Bruegger*, we considered an important question regarding the applicability of *Roper* concepts outside the death penalty context. There, an *adult* offender received a lengthy enhanced sentence as a result of a previous conviction that occurred when he was twelve years old. 773 N.W.2d 867. Under federal precedent, such offenders were to be treated as adults, not juveniles. *Id.* at 879. While we recognized that *Roper* was

a death penalty case, we concluded that the reasoning in *Roper*, namely, that juveniles are materially different from adults for the purposes of assessing criminal culpability, had broad applicability outside the death penalty context. *Id.* at 883–84. As a result, we held under the cruel and unusual punishment provision of article I, section 17 of the Iowa Constitution that Bruegger was entitled to launch an as-applied challenge to his lengthy prison sentence arising in part as a result of a previous juvenile conviction. *Id.* at 884. *Bruegger* thus stands for the proposition that under the Iowa Constitution, the concept embraced in *Roper*—that juveniles have less culpability than adults—has broad application outside the death penalty context.[6]

**F. Application of Cruel and Unusual Punishment Principles.**

1. *Introduction.* As indicated above, Null challenges his sentence under the Eighth Amendment to the United States Constitution and article I, section 17 of the Iowa Constitution. In this case, Null urges that we take the principles of *Miller* and apply them under the facts of this case under the Iowa Constitution. *See id.* at 883 (applying principles espoused in *Roper* in a more stringent fashion under the Iowa Constitution than had been explicitly adopted by the Supreme Court under the United States Constitution). As explained at length below, we are persuaded that *Miller*'s principles are sound and should be applied in

---

[6]*See* Beth Caldwell, *Twenty-Five to Life for Adolescent Mistakes: Juvenile Strikes as Cruel and Unusual Punishment*, 46 U.S.F. L. Rev. 581, 615 (2012) ("The reasoning employed in Bruegger is bolstered by the Graham decision, which extended Roper to a non-death penalty case."); *see also* Christopher J. Walsh, Comment, *Out of the Strike Zone: Why* Graham v. Florida *Makes it Unconstitutional to Use Juvenile Convictions as Strikes to Mandate Life Without Parole Under § 841(B)(1)(A)*, 61 Am. U. L. Rev. 165, 186–204 (2011) (urging the extension of *Graham* to prohibit enhancement of sentences to mandatory life without parole based on juvenile-age prior convictions for defendants convicted of drug trafficking in violation of 21 U.S.C. § 841).

this case.  As in *Bruegger*, we reach our conclusion independently under article I, section 17 of the Iowa Constitution.[7]

2. *Applicability of the principles underlying* Roper*,* Graham*, and* Miller.  Null received a lengthy term-of-years sentence based on the aggregation of his sentences for second-degree murder and first-degree robbery.  A threshold question is whether a 52.5-year minimum prison term for a juvenile based on the aggregation of mandatory minimum sentences for second-degree murder and first-degree robbery triggers the protections to be afforded under *Miller*—namely, an individualized sentencing hearing to determine the issue of parole eligibility.  We think it does.  We come to this conclusion for several reasons.

First, we note that *Miller* emphasizes that nothing said in *Roper*, *Graham*, or *Miller* is "crime-specific."  *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 420.  Certainly the notions that juveniles have less-developed judgment, that juveniles are more susceptible to peer

---

[7]A decision of this court to depart from federal precedent arises from our independent and unfettered authority to interpret the Iowa Constitution.  *State v. Baldon*, 829 N.W.2d 785, 790 (Iowa 2013) ("[O]ur right under principles of federalism to stand as the final word on the Iowa Constitution is settled, long-standing, and good law.").  When a state constitutional issue is raised by a party, we have a duty to engage in independent analysis of the claim.  In considering state constitutional claims, we consider federal precedent as well as the precedents from other states for their persuasive power.  *See, e.g.*, *id.* at 791 & n.1 ("[T]he Supreme Court's jurisprudence regarding the freedom from unreasonable searches and seizures under the Fourth Amendment—or any other fundamental, civil, or human right for that matter—makes for an admirable floor, but it is certainly not a ceiling."); *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010) ("[W]hile United States Supreme Court cases are entitled to respectful consideration, we will engage in independent analysis of the content of our state search and seizure provisions.  A Fourth Amendment opinion of the United States Supreme Court, the Eighth Circuit Court of Appeals, or any other federal court is no more binding upon our interpretation of article I, section 8 of the Iowa Constitution than is a case decided by another state supreme court under a search and seizure provision of that state's constitution.").  We recognize this framework as the *Tonn–Ochoa* analysis.  *Baldon*, 829 N.W.2d at 791.  Any decision to depart from federal precedent is no more "value-laden," to use the terminology of the dissent, than a decision to follow federal precedent.  *See, e.g.*, *State v. Breuer*, 577 N.W.2d 41, 44–45 (Iowa 1998) (applying federal constitutional principles under article I, section 8 of the Iowa Constitution).

pressure, and that juveniles' characters are not fully formed applies to this and any other case involving a juvenile defendant. Thus, the notions in *Roper, Graham,* and *Miller* that "children are different" and that they are categorically less culpable than adult offenders apply as fully in this case as in any other. The approach of *Roper, Graham,* and *Miller* is consistent with other areas of the law where the differences between juveniles and adults are well recognized.

Second, we believe that while a minimum of 52.5 years imprisonment is not technically a life-without-parole sentence, such a lengthy sentence imposed on a juvenile is sufficient to trigger *Miller*-type protections. Even if lesser sentences than life without parole might be less problematic, we do not regard the juvenile's potential future release in his or her late sixties after a half century of incarceration sufficient to escape the rationales of *Graham* or *Miller*. The prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a "meaningful opportunity" to demonstrate the "maturity and rehabilitation" required to obtain release and reenter society as required by *Graham*. 560 U.S. at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46.

We recognize that the evidence in this case does not clearly establish that Null's prison term is beyond his life expectancy. A generalized mortality table submitted in the district court suggests that Null's sentence may closely come within two years of his life expectancy, but not exceed it. It may be, as some have suggested, that long-term incarceration presents health and safety risks that tend to decrease life expectancy as compared to the general population. *See, e.g., People v. J.I.A.,* No. G040625, 2013 WL 342653, at *5 (Cal. Ct. App. Jan. 30, 2013) (unpublished opinion) (determining it is reasonable to conclude that a

prisoner's life expectancy is considerably shorter than indicated on standard mortality tables); *People v. Lucero*, __ P.3d ___, ___, 2013 WL 1459477, at *4 (Colo. App. 2013) (recognizing argument, but rejecting it for failure to press in district court). In any event, while some courts have concluded that whether potential release might occur within a defendant's life expectancy is a key factual issue, *see, e.g., People v. Caballero*, 282 P.3d 291, 295 (Cal. 2012) (holding a minimum 110-year sentence following three convictions of attempted murder violated the Eighth Amendment); *see also State v. Ragland*, 836 N.W.2d 107, 120 (Iowa 2013) (discussing the split in authority over whether *Graham* applies to a de facto life sentence), we do not believe the determination of whether the principles of *Miller* or *Graham* apply in a given case should turn on the niceties of epidemiology, genetic analysis, or actuarial sciences in determining precise mortality dates. In coming to this conclusion, we note the repeated emphasis of the Supreme Court in *Roper*, *Graham*, and *Miller* of the lessened culpability of juvenile offenders, how difficult it is to determine which juvenile offender is one of the very few that is irredeemable, and the importance of a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46. We also note that in the flurry of legislative action that has taken place in the wake of *Graham* and *Miller*, many of the new statutes have allowed parole eligibility for juveniles sentenced to long prison terms for homicides to begin after fifteen or twenty-five years of incarceration.[8]

---

[8]*See, e.g.*, Cal. Penal Code § 1170(d)(2) (West, Westlaw current through ch. 70 of 2013 Reg. Sess.) (offering juvenile offenders sentenced to life without parole several opportunities to ask for a reduced sentence of twenty-five years to life beginning after fifteen years imprisonment); Del. Code Ann. tit. 11 § 4209A (West, Westlaw current through 79 Laws 2013, chs. 1–61) (providing the possibility of parole eligibility to

We conclude that *Miller*'s principles are fully applicable to a lengthy term-of-years sentence as was imposed in this case because an offender sentenced to a lengthy term-of-years sentence should not be worse off than an offender sentenced to life in prison without parole who has the benefit of an individualized hearing under *Miller*. We recognize that some courts have viewed *Miller* more narrowly, holding that it applies only to mandatory sentences of life without parole. *See, e.g.*, *People v. Sanchez*, No. B230260, 2013 WL 3209690, at *6 (Cal. Ct. App. June 25, 2013) (unpublished opinion) (holding *Miller* does not apply to a mandatory minimum prison term of fifty years, which stemmed from a homicide conviction); *People v. Perez*, 154 Cal. Rptr. 3d 114, 120 (Ct. App. 2013) (holding *Miller* does not apply to a mandatory thirty-year minimum

---

juveniles convicted of first-degree murder after twenty-five years); N.C. Gen. Stat. Ann. § 15A-1340.19A (West, Westlaw current through S.L. 2013–128, 130–144 of the 2013 Reg. Sess.) (providing parole eligibility for juveniles convicted of first-degree murder after twenty-five years imprisonment); 18 Pa. Cons. Stat. Ann. § 1102.1(a) (West, Westlaw current through Reg. Sess. Act 2013–11) (providing parole eligibility for juveniles age fifteen and older convicted of homicide after thirty-five years and for those under fifteen years of age after twenty-five years); Utah Code Ann. §§ 76-5-202(3)(e), 76-3-207.7 (West, Westlaw current through 2013 Gen. Sess.) (providing that juveniles convicted of first-degree murder are eligible for parole after serving twenty-five years); Wyo. Stat. Ann. § 6-10-301(c) (West, Westlaw current through 2013 Gen. Sess.) (providing parole eligibility for juveniles convicted of first-degree murder after twenty-five years imprisonment); *see also* H.R. 1993, 89th Gen. Assemb., Reg. Sess. (Ark. 2013) (amending Arkansas Code section 5–10–101(c) to provide that juveniles convicted of first-degree murder may be sentenced to life in prison without possibility of parole for twenty-eight years); H.R. 152, 2013 Reg. Sess. (La. 2013) (providing, in newly enacted section 15.574.4(E) of Louisiana Revised Statutes, the possibility of parole eligibility for juveniles convicted of first or second-degree murder after thirty-five years imprisonment); L. 44, 103d Leg., 1st Sess. (Neb. 2013) (giving a trial court discretion to impose a term-of-years sentence ranging from forty years to life after considering specific factors related to youth); S. 239, 2013 Leg. Assemb., 88th Sess. (S.D. 2013) (granting a trial court discretion to impose a sentence less than life without parole on a juvenile convicted of first or second-degree murder following consideration of specific factors related to youth and providing that life without parole "should normally be reserved for the worst offenders and the worst cases").

sentence for rape and committing a forcible lewd act); *James v. United States*, 59 A.3d 1233, 1236–38 (D.C. 2013) (holding *Miller* does not apply to a thirty-year-to-life sentence for first-degree murder); *People v. Richards*, No. 4–11–1051, 2012 WL 7037330, at *5 (Ill. App. Ct. Nov. 26, 2012) (unpublished opinion). We think these cases seek to avoid the basic thrust of *Roper*, *Graham*, and *Miller* by refusing to recognize the underlying rationale of the Supreme Court is not crime specific. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 420. Further, our holding today is consistent with our approach in *Bruegger*, where we applied *Roper* concepts in a cruel and unusual punishment challenge to a term-of-years sentence. *See* 773 N.W.2d at 883–84.

We also recognize that some courts have held *Miller* does not apply where the lengthy sentence is the result of aggregate sentences. *See, e.g.*, *Bunch v. Smith*, 685 F.3d 546, 550–51 (6th Cir. 2012) (holding *Miller* does not apply to an eighty-nine-year sentence resulting from consecutive fixed-term sentences for multiple nonhomicide offenses), *cert. denied*, 569 U.S. ___, 133 S. Ct. 1996 (2013); *Walle v. State*, 99 So. 3d 967, 972–73 (Fla. Dist. Ct. App. 2012) (holding *Miller* does not apply where the defendant received a ninety-two-year aggregate sentence). *Cf. Henry v. State*, 82 So. 3d 1084, 1089 (Fla. Dist. Ct. App. 2012) (holding *Graham* does not apply to an aggregate term-of-years sentence totaling ninety years). We think it does for multiple reasons. First, we note that in *Miller*, one of the juvenile offenders was convicted of multiple crimes. 567 U.S. at ___, 132 S. Ct. at 2461, 183 L. Ed. 2d at 415. The Supreme Court, however, offered no indication in *Miller* that his convictions for multiple crimes affected the analysis. Further, after *Miller*, the Supreme Court in several cases involving aggregate crimes granted certiorari, vacated the sentence, and remanded for consideration in light of *Miller*.

*See Blackwell v. California*, 568 U.S. \_\_\_, \_\_\_, 133 S. Ct. 837, 837, 184 L. Ed. 2d 646, 646 (2013) (granting, vacating, and remanding *People v. Blackwell*, 134 Cal. Rptr. 3d 608, 618 (Ct. App. 2011) (upholding discretionary life-without-parole sentence for first-degree murder, burglary of an inhabited dwelling, and attempted robbery of an inhabited dwelling)); *Mauricio v. California*, 568 U.S. \_\_\_, \_\_\_, 133 S. Ct. 524, 524, 184 L. Ed. 2d 335, 335 (2012) (granting, vacating, and remanding *People v. Mauricio*, No. B224505, 2011 WL 5995976, at *9 (Cal. Ct. App. Nov. 28, 2011) (unpublished opinion) (upholding three life-without-parole sentences for one juvenile convicted on three counts of first-degree murder)); *Bear Cloud v. Wyoming*, 568 U.S. \_\_\_, \_\_\_, 133 S. Ct. 183, 183–84, 184 L. Ed. 2d 5, 5 (2012) (granting, vacating, and remanding *Bear Cloud v. State*, 275 P.3d 377, 402 (Wyo. 2012) (upholding life-without-parole sentence for juvenile convicted of first-degree murder, conspiracy to commit aggravated burglary, and aggravated burglary)); *Whiteside v. Arkansas*, 567 U.S. \_\_\_, \_\_\_, 133 S. Ct. 65, 66, 183 L. Ed. 2d 708, 708 (2012), (granting, vacating, and remanding *Whiteside v. State*, 383 S.W.3d 859, 866 (Ark. 2011) (upholding juvenile's sentence of life-without-parole for capital murder and thirty-five-years for aggravated robbery)). While we think the fact that the defendants were convicted of multiple crimes may well be relevant in the analysis of individual culpability under *Miller*, we agree with appellate courts that have concluded the imposition of an aggregate sentence does not remove the case from the ambit of *Miller*'s principles. *See, e.g., People v. Cerda*, Nos. B232572, B235674, 2013 WL 3778240 (Cal. Ct. App. July 18, 2013) (unpublished opinion) (vacating a sentence of 410 months to life for one second-degree murder conviction and twenty-three premeditated attempted murder convictions under *Miller*); *People v. Thomas*, 150 Cal.

Rptr. 3d 361, 363, 382–83 (Ct. App. 2012) (vacating, in light of *Miller*, a sentence of one hundred ninety-six years to life following convictions on two counts of murder, three counts of attempted murder, and two counts of shooting at an occupied motor vehicle and remanding for resentencing); *People v. Argeta*, 149 Cal. Rptr. 3d 243, 245 (Ct. App. 2012) (vacating, under *Miller* and *Caballero*, a juvenile's minimum aggregate sentence totaling one hundred years for aiding and abetting in one count of murder and in five counts of attempted murder and remanding for resentencing).

3. *Content of sentencing requirements in juvenile cases.* Having determined the rationale of *Miller* applies to this case, we now consider what the district court is required to do in deciding whether a juvenile defendant should be sentenced to a half century in prison. The Supreme Court has directed that a trial court must undertake an analysis of "[e]verything [it] said in *Roper* and *Graham*" about youth. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 422.

We think the direction from the Supreme Court that trial courts consider everything said about youth in *Roper*, *Graham*, and *Miller* means more than a generalized notion of taking age into consideration as a factor in sentencing. *See People v. Araujo*, Nos. B235844, B240501, 2013 WL 840995, at *5 (Cal. Ct. App. March 7, 2013) (unpublished opinion) (indicating the district court's passing reference to the defendant's "tender age" in sentencing hearing does not eliminate need to vacate sentence and remand in light of *Miller* requirements); *People v. Rosales*, No. F061036, 2012 WL 4749427, at *24 (Cal. Ct. App. Oct. 5, 2012) (unpublished opinion) ("*Miller* changed the law on what factors are applicable by elaborating extensively on the ways in which a defendant's youth is relevant . . . ."). Instead, we conclude article I, section 17

requires that a district court recognize and apply the core teachings of *Roper, Graham,* and *Miller* in making sentencing decisions for long prison terms involving juveniles. *See, e.g., Araujo,* 2013 WL 840995, at *5 (remanding for on-the-record findings where pre-*Miller* record did not demonstrate consideration of *Miller* factors); *State v. Simmons,* 99 So. 3d 28, 28 (La. 2012) (per curiam) (remanding to the district court for reconsideration of the defendant's sentence of life imprisonment at hard labor without possibility of parole imposed in 1995 in light of *Miller* and requiring the court to make findings on the record); *State v. Fletcher,* 112 So. 3d 1031, 1036 (La. Ct. App. 2013) (finding that while sentencing court considered some of the factors enumerated in *Miller,* the court's consideration lacked depth); *Bear Cloud,* 294 P.3d at 47–48 (vacating a sentence and detailing *Miller* factors to be considered by the sentencing court on remand).

First, the district court must recognize that because "children are constitutionally different from adults," they ordinarily cannot be held to the same standard of culpability as adults in criminal sentencing. *Miller,* 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418; *see also Ragland,* 836 N.W.2d at 119. The constitutional difference arises from a juvenile's lack of maturity, underdeveloped sense of responsibility, vulnerability to peer pressure, and the less fixed nature of the juvenile's character. *Miller,* 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418; *see also Graham,* 560 U.S. at ___, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841; *Roper,* 543 U.S. at 569–70; 125 S. Ct. at 1195–96, 161 L. Ed. 2d at 21–22.

If a district court believes a case presents an exception to this generally applicable rule, the district court should make findings discussing why the general rule does not apply. *See, e.g., Simmons,* 99

So. 3d at 28; *Fletcher*, 112 So. 3d at 1036–37.  In making such findings, the district court must go beyond a mere recitation of the nature of the crime, which the Supreme Court has cautioned cannot overwhelm the analysis in the context of juvenile sentencing.  *See Graham*, 560 U.S. at ___, 130 S. Ct. at 2032, 176 L. Ed. 2d at 847; *Roper*, 543 U.S. at 572–73, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24.  Further, the typical characteristics of youth, which include immaturity, impetuosity, and poor risk assessment, are to be regarded as mitigating, not aggravating factors.  *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467–69, 183 L. Ed. 2d at 422–24.

Second, the district court must recognize that "[j]uveniles are more capable of change than are adults" and that as a result, "their actions are less likely to be evidence of 'irretrievably depraved character.' " *Graham*, 560 U.S. at ___, 130 S. Ct. at 2026, 176 L. Ed. 2d at 841 (quoting *Roper*, 543 U.S. at 570, 125 S. Ct. at 1195, 161 L. Ed. 2d at 22); *accord Miller*, 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 418. While some juvenile offenders may be irreparably lost, it is very difficult to identify juvenile offenders that fall into this category.  As the Supreme Court noted, even expert psychologists have difficulty making this type of prediction.  *Graham*, 560 U.S. at ___, ___, 130 S. Ct. at 2026, 2029, 176 L. Ed. 2d at 841, 844; *Roper*, 543 U.S. at 573, 125 S. Ct. at 1197, 161 L. Ed. 2d at 24.  Further, the district court must recognize that most juveniles who engage in criminal activity are not destined to become lifelong criminals.  *Miller*, 567 U.S. at ___, 132 S. Ct. at 2464, 183 L. Ed. 2d at 419; *Graham*, 560 U.S. at ___, 130 S. Ct. at 2029, 176 L. Ed. 2d at 844; *Roper*, 543 U.S. at 570, 125 S. Ct. at 1195–96, 161 L. Ed. 2d at 22. The " 'signature qualities' of youth are all 'transient.' " *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467, 183 L. Ed. 2d at 422 (quoting *Johnson,* 509 U.S.

at 368, 113 S. Ct. at 2669, 125 L. Ed 2d at 306).  Because "incorrigibility is inconsistent with youth," care should be taken to avoid "an irrevocable judgment about [an offender's] value and place in society."  *Miller*, 567 U.S. at ___, 132 S. Ct. at 2465, 183 L. Ed. 2d at 419 (citation and internal quotation marks omitted).

Finally, and related to the previous discussion, the district court should recognize that a lengthy prison sentence without the possibility of parole such as that involved in this case is appropriate, if at all, only in rare or uncommon cases.  *Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424; *see also Rosales*, 2012 WL 4749427, at *24 (remanding for sentencing court determination of whether the case presents the rare or uncommon juvenile offender whose crime reflects incorrigible corruption).

At the same time, it bears emphasis that while youth is a mitigating factor in sentencing, it is not an excuse.  *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2469, 183 L. Ed. 2d at 424; *Graham*, 560 U.S. at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46; *Roper*, 543 U.S. at 570, 125 S. Ct. at 1196, 161 L. Ed. 2d at 22; *see also Atkins*, 536 U.S. at 320, 122 S. Ct. at 2252, 153 L. Ed. 2d at 349–50; *Johnson*, 509 U.S. at 368, 113 S. Ct. at 2669, 125 L. Ed. 2d at 306.  Nothing that the Supreme Court has said in these cases suggests trial courts are not to consider protecting public safety in appropriate cases through imposition of significant prison terms.  Further, it bears emphasis that nothing in *Roper, Graham,* or *Miller* guarantees that youthful offenders will obtain eventual release.  All that is required is a "meaningful opportunity" to

demonstrate rehabilitation and fitness to return to society. *Graham*, 560 U.S. at ___, 130 S. Ct. at 2030, 176 L. Ed. 2d at 845–46. [9]

4. *Application in this case.* In this case, it is important to point out that the district court did not have the benefit of *Miller* or this opinion during sentencing. *Miller* extended the reasoning of *Roper* and *Graham* outside the settings of the death penalty and nonhomicide offenses, and we have concluded that the analysis of *Miller*, and by implication that of *Roper* and *Graham*, applies to the very lengthy mandatory minimum sentence without the possibility of parole at issue in this case. Now that we and the Supreme Court have provided clearer guidance on the considerations to be given in sentencing, the appropriate course is to vacate the sentence imposed on Null and remand the case to the district court. Because *Miller* and our opinion offer guidance regarding the sentencing proceeding, the district court on remand should reopen the

---

[9]Some have suggested a lack of "certainty" in our disposition. The demand for certainty, however, is a double-edged sword. In *Miller*, as here, more certainty could have been achieved by a categorical approach—one saying that life without parole or its equivalent can never be imposed on a juvenile offender. Categorical or rule-based solutions may have the advantage of clarity, but they also have a countervailing disadvantage, namely, that they limit case-by-case consideration of facts that might be crucial to a satisfactory outcome. In other words, categorical rules are almost always overinclusive, underinclusive, or both. The teaching of *Miller* is that the assumption that juveniles should be treated as adults for the purposes of life-without-parole sentences is dramatically overinclusive and constitutionally unacceptable. At the same time, *Miller* declined to adopt the opposite rule-based approach, namely, that juveniles can never be subject to life in prison without parole. We utilize the *Miller* approach in this case.

Further, slippery-slope arguments, like arguments seeking certainty, are two-way streets. Frederick Schauer, *Slippery Slopes*, 99 Harv. L. Rev. 361, 381 (1985) ("[I]n virtually every case in which a slippery-slope argument is made, the opposing party could with equal formal and linguistic logic also make a slippery slope claim."). One could plausibly employ a slippery-slope argument to suggest the elimination of the Cruel and Unusual Punishments Clauses of the State and Federal Constitutions by deferring to other branches of government.

record to allow the parties to make additional evidentiary presentation. *Bruegger*, 773 N.W.2d at 885–86.

Because of our disposition of this case, it would be premature at this time to consider issues that need not be decided today. For instance, we do not consider whether the sentence in this case would be cruel and unusual under a gross proportionality or any other type of proportionality analysis. Any proportionality question will be considered only after the district court applies the principles of *Miller* to Null's sentence. Further, we do not decide whether mandatory minimum sentences for adults may be automatically imposed upon juveniles without consideration of the diminished culpability of juvenile defendants. Similarly, like in *Miller*, we do not decide whether lengthy sentences of fifty years in prison or more are categorically banned. We simply conclude that under article I, section 17 of the Iowa Constitution, this case must be remanded to the district court for resentencing in light of the requirement of *Miller* that the district court consider all that was said in *Roper* and its progeny about the distinctive qualities of youth. We emphasize that the sole issue on remand is whether Null may be required to serve 52.5 years in prison before he is eligible for parole consideration.

We recognize that upon remand, one of the issues the district court will need to consider is the question of whether Null's sentences for second-degree murder and first-degree robbery will run concurrently or consecutively. Ordinarily, such a determination rests within the sound discretion of the district court. Here, however, the district court must consider whether the imposition of consecutive sentences would result in a prison term of such length that it cannot survive under the cruel and

unusual punishment provision of the Iowa Constitution. *Cf. People v. Keough,* 120 Cal. Rptr. 817, 825–26 (Ct. App. 1975).

### V. Conclusion.

For the reasons expressed above, the sentence in this case is vacated. We remand the case to the district court for resentencing consistent with this opinion.

**DISTRICT COURT SENTENCE VACATED AND CASE REMANDED WITH INSTRUCTIONS.**

All justices concur except Mansfield, J., who files a concurrence in part and dissent in part in which Waterman, J., joins; and Zager, J., who files a separate concurrence in part and dissent in part.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I join in the court's opinion to the extent it affirms the defendant's convictions. I respectfully dissent as to the reversal of the defendant's sentence.

To begin with, I believe the sentencing proceeding in this case complied with *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The relevant factors relating to Null's youth were brought to light and considered. Yet even if one were to conclude the sentencing didn't comply with *Miller*, the remedy would be straightforward: a remand for the district court to apply *Miller*.

Unfortunately, the majority opinion goes well beyond that, providing pages of material. Yet at a critical point, the majority's reasoning is cursory. The majority invokes the Iowa Constitution in a brief paragraph without explaining why it is doing so and whether it intends to depart from *Miller*. This creates additional and unnecessary uncertainty as to the scope and meaning of the majority opinion.

In addition to the aforementioned concerns, I agree with my colleague Justice Zager that the district court did not abuse its discretion in imposing consecutive sentences and therefore join part II of his dissent.

## I. Background.

Let us review the facts: Denem Null and two companions felt they had been slighted in a drug transaction. Null stole a handgun. Null and his companions then forced their way into an apartment, intending to rob the residents. The victim, an innocent bystander who was not a drug user or dealer, stood at the door. Null pointed the gun at him and demanded the "f_____" marijuana. The victim told Null and his

companions to leave. Null shot the victim twice in the head, killing him. Null then pointed the gun at the victim's companion, who turned her head, fearing she would be shot. At that point, however, someone in the back bedroom opened a door. Null and his companions realized there were additional persons in the apartment and decided to flee. After Null was arrested and read his rights, he stated that "he did not care that he was going to jail for life for murder."

Null was originally charged with first-degree murder. However, a plea agreement was reached. The State added a charge of first-degree robbery; Null agreed to plead guilty to that charge and to a charge of second-degree murder; the first-degree murder charge was dismissed. Under the plea agreement, whether the murder and robbery sentences would run concurrently or consecutively was left up to the court to determine at sentencing. Null understood the State was going to argue for consecutive sentences. If the sentences were concurrent, this would mean thirty-five years imprisonment before parole eligibility; consecutive sentences would mean 52.5 years.

By the time of the sentencing hearing, Null had turned eighteen. The presentence investigation (PSI), which the district court clearly had read and which it discussed at the sentencing, recommended concurrent sentences. In explaining this recommendation, the PSI cited the defendant's age. The PSI also described Null's difficult family circumstances. Yet, in addition, it quoted Null's acknowledgment, "I had everything I needed to do right." Following verbal presentations by the victim's family, the prosecutor, and defense counsel, Null was given the opportunity to address the court. He told the court, "I ain't got nothing to say." The district court decided to make the two sentences consecutive. It gave a detailed explanation for its decision.

Our task on appeal should be straightforward. Null was sentenced before the United States Supreme Court decided *Miller*. Now we have the benefit of *Miller*. We need to determine whether Null's existing sentence comports with *Miller*. If it doesn't, then we need to remand the case for the district court to resentence in light of *Miller*. Unfortunately, the majority overlooks the first issue and overdoes the second.

Moreover, at the end of its opinion, the majority needlessly injects uncertainty into its ruling by detouring into Iowa constitutional law. Although the relevant precedent (*Miller*) is a federal constitutional case decided only one year ago, the majority proclaims that it is applying "the principles of *Miller. . .* under the Iowa Constitution." What this statement means is unclear. How do you "apply" a federal constitutional decision under the state constitution? I fear this strange statement will lead to confusion among lawyers and judges. Instead, we should be direct and clear about whether we are requiring something that *Miller* does not require.

## II. Null's Sentence Does Not Violate *Miller*.

I do not believe Null's sentence violates *Miller*; hence, in my view, no resentencing is necessary. I will assume for the sake of argument that Null's murder sentence and his robbery sentence should be aggregated into one sentence because they arose out of a single course of events. I will also assume for the sake of argument that a requirement to serve 52.5 years minimum before parole eligibility is a de facto life without parole (LWOP) sentence, although this is a close call. *See People v. Caballero*, 282 P.3d 291, 295 (Cal. 2012) (finding that a 110-year sentence amounts to de facto LWOP and focusing on whether the parole eligibility date falls outside the defendant's natural life expectancy); *People v. Rainer*, ___ P.3d ___, ___, 2013 WL 1490107, at *12–14 (Colo.

Ct. App. 2013) (surveying the caselaw and finding that a sentence under which the defendant must serve fifty-six years before being eligible for parole at the age of seventy-five was a de facto LWOP sentence); *Adams v. State*, ___ So. 3d ___, ___, 2012 WL 3193932, at *2 (Fla. Dist. Ct. App. 2012) (concluding that a sentence of 58.5 years in prison was a de facto LWOP sentence where the defendant would not be eligible for release until he was nearly seventy-six); *Floyd v. State*, 87 So. 3d 45, 47 (Fla. Dist. Ct. App. 2012) (holding that a combined eighty-year sentence was a functional LWOP sentence where the defendant would not be eligible for parole until age eighty-five, exceeding the defendant's life expectancy); *Parker v. State*, 119 So. 3d 987, 997–99, 2013 WL 2436630, at *8–10 (Miss. 2013) (finding that a life sentence where the defendant would be eligible for conditional release at age sixty-five was covered by *Miller* while noting that conditional release "is more akin to clemency" than parole). *But see Bunch v. Smith*, 685 F.3d 546, 547, 552 (6th Cir. 2012) (holding that an eighty-nine-year cumulative sentence for the robbery, kidnapping, and repeated rape of one victim committed when the defendant was a juvenile did not clearly violate the prohibition on LWOP sentences of juveniles for nonhomicide offenses), *cert. denied*, 569 U.S. ___, 133 S. Ct. 1996 (2013); *Silva v. McDonald*, 891 F. Supp. 2d 1116, 1131 (C.D. Cal. 2012) (finding that a sentence of forty years to life did not violate the Eighth Amendment, where the defendant was sixteen years old at the time of the crime and would be eligible for parole before he turned sixty); *State v. Kasic*, 265 P.3d 410, 415 (Ariz. Ct. App. 2011) (concluding that *Graham v. Florida* does not apply to consecutive term-of-years sentences for various offenses that exceed a juvenile's life expectancy); *People v. Perez*, 154 Cal. Rptr. 3d 114, 119–21 (Cal. Ct. App. 2013) (finding that Perez's sentence, which made him parole eligible at

age forty-seven, allowed the possibility of "meaningful life expectancy" after prison and was therefore not de facto LWOP); *People v. Lucero*, ___ P.3d ___, ___, 2013 WL 1459477, at *3–4 (Colo. App. 2013) (holding that an aggregate eighty-four year sentence was not de facto LWOP where the defendant would be parole eligible by age fifty-seven—"well within his natural lifetime"); *People v. Lehmkuhl*, ___ P.3d ___, ___ 2013 WL 3584754, at *3 (Colo. App. 2013) (holding that a sentence where the defendant would be eligible for parole at age sixty-seven was not the functional equivalent of life without parole); *James v. United States*, 59 A.3d 1233, 1238–39 (D.C. 2013) (finding that imposition of a thirty-year mandatory minimum sentence on a juvenile defendant did not violate *Miller*); *Walle v. State*, 99 So. 3d 967, 972–73 (Fla. Ct. App. 2012) (finding that a sentence of sixty-five years for one episode of criminal conduct was not de facto LWOP, even though defendant would have to serve eighty-five percent of this amount before being eligible for parole); *Thomas v. State*, 78 So. 3d 644, 646 (Fla. Ct. App. 2011) ("Appellant asks this Court to apply *Graham* to his case and find that his concurrent fifty-year sentences are the functional equivalent of life sentences. . . .  While we agree that at some point, a term-of-years sentence may become the functional equivalent of a life sentence, we do not believe that situation has occurred in the instant case."); *Middleton v. State*, 721 S.E.2d 111, 112–13 (Ga. Ct. App. 2011) (determining that an aggregate sentence of thirty years without parole imposed on a juvenile was not unconstitutional under the United States Supreme Court's authority), *cert. denied*, ___ U.S. ___, 132 S. Ct. 867 (2013); *State v. Brown*, 118 So. 3d 332, 341–42, 2013 WL 1878911, at *15–16 (La. 2013) (holding that a cumulative term-of-years sentence for one criminal episode should not be treated as LWOP even though the defendant would not be eligible for

parole until he was eighty-six); *Angel v. Commonwealth*, 704 S.E.2d 386, 401–02 (Va. 2011) (finding that consecutive life sentences were not de facto LWOP because the defendant could petition for conditional release at age sixty).

Nevertheless, the district court had discretion whether to impose consecutive or concurrent sentences. Concurrent sentences would have made Null eligible for parole after serving thirty-five years. Thus, the outcome of 52.5 years before parole eligibility was not mandatory. Additionally, before making the sentences consecutive rather than concurrent, the district court did take into account Null's youth and its "distinctive attributes." *Miller,* ___ U.S. at ___, 132 S. Ct. at 2464–69, 183 L. Ed. 2d at 418–23. Indeed, this was virtually all Null's attorney argued at sentencing, where he urged the court to run the sentences concurrently rather than consecutively.[10]

---

[10]For example:

> My client, Your Honor, at age 16 made a bad decision. And like many people that are age 16 they are not capable of making good decisions sometimes. They are unable to think about what if, what is beyond this immediate decision that I am making.
>
> . . . He made that bad decision. And he didn't have the foresight, the maturity, the wisdom to ask himself what if. What if.
>
> . . . .
>
> If you look at the biographical information on Mr. Null, this was almost predetermined. His involvement with the court system was almost predetermined.
>
> . . . .
>
> Mr. Null did not have the mentoring, did not have the role models, did not have the upbringing some of us are fortunate enough to have. . . .
>
> It is a terrible tragedy. . . . It results from a mistake. The mistakes of a young man who couldn't see past the length of his arm as to what could have happened, as to what ultimately did happen.
>
> Your Honor, I'm asking you to impose these sentences concurrently as a recognition of that mistake of youth.

In other words, the court did what it was supposed to do under *Miller*. It took into account all the mitigating evidence relating to Null's youth, but ultimately found it was outweighed by other considerations. At sentencing, Null's attorney argued almost all of the *Miller* factors, including his client's chronological age, his lack of maturity, the absence of mentoring or a stable upbringing, and the circumstances of the offense including the extent of Null's participation. Any *Miller* factors not expressly raised by Null's counsel were clearly considered by the district court, as evidenced by its remarks at sentencing. For these reasons, I believe the sentencing here complied with *Miller*.

A Connecticut appellate court has reached a similar conclusion in like circumstances in *State v. Riley*, 58 A.3d 304 (Conn. App. Ct. 2013), *certification granted in part by* 61 A.3d 531 (2013). The trial court there had imposed an LWOP sentence pre-*Miller*, which the court of appeals sustained post-*Miller*:

> [E]ven though the defendant declined to avail himself fully of the opportunity to present mitigating evidence related to his youth and upbringing, it is clear that the court was cognizant of these issues and searched the presentence investigation report for circumstances that might have militated against imposing a life without parole sentence.

*Id.* at 310. The Connecticut appellate court also declined to require sentencing courts to engage in express, on-the-record consideration of the incidents of youth. *Id.* at 315 (observing that "sentencing, of course, is not a science"); *see also Conley v. State*, 972 N.E.2d 864, 870, 880 (Ind. 2012) (upholding a pre-*Miller* LWOP sentence for a juvenile convicted of murder where the sentence was not mandatory and the sentencing court had considered the defendant's youth as a mitigating factor).

In summary, and contrary to my colleagues' suggestion, what the district court did here involved far more than "a generalized notion of taking age into consideration as a factor in sentencing."[11]

**III. Even if the Sentence Violated *Miller*, We Should Just Remand for Resentencing in Light of *Miller*.**

But even if we believe the sentence did not comply with *Miller*, there is a simple solution: We should just remand for the district court to apply *Miller*. This requires only a brief opinion, such as what we say in footnote 5 of our opinion this term in *State v. Ragland*, 836 N.W.2d 107, 113 n.5 (Iowa 2013). The district court can read *Miller* as well as we can.

The Wyoming Supreme Court's decision in *Bear Cloud v. State*, 294 P.3d 36 (Wyo. 2013), is an excellent model for a post-*Miller* remand. In approximately two pages of discussion, the court there basically just quotes from *Miller*. *Id.* at 46–48. It lists seven "factors" drawn from *Miller* for the trial court to consider on resentencing. *Id.* at 47.[12] And

---

[11]As noted above, I also join part II of Justice Zager's dissent concluding that the district court did not abuse its discretion in imposing consecutive sentences. In addition, I do not believe that Null's sentence can be viewed as grossly disproportionate to his crime and therefore unconstitutional within the meaning of *Bruegger*. *See State v. Bruegger*, 773 N.W.2d 862 (Iowa 2009). Null brought a handgun to a planned armed robbery and, in the course of that robbery, shot the victim twice in the head and killed him instantly. Null was nearly seventeen when he committed this crime; *Bruegger*, by contrast, involved the use of a preteen juvenile adjudication to dramatically enhance the defendant's punishment. *Id.* at 884–85.

[12]Those factors are:

(a) "the character and record of the individual offender [and] the circumstances of the offense," *Miller*, 567 U.S. at ___, 132 S. Ct. at 2467 (quotation marks omitted);

(b) "the background and mental and emotional development of a youthful defendant," *id.*;

(c) a juvenile's "chronological age and its hallmark features-among them, immaturity, impetuosity, and failure to appreciate the risks and consequences," *id.*, 567 U.S. at ___, 132 S. Ct. at 2468;

(d) "the family and home environment that surrounds" the juvenile, "no matter how brutal or dysfunctional," *id.*;

then it tells the district court to do its job. *See also Jackson v. Norris*, \_\_\_ S.W.3d \_\_\_, \_\_\_, 2013 WL 1773087, at *7–8 (Ark. 2013) (on remand from the United States Supreme Court, severing the unconstitutional provisions from the statute and then telling the trial court simply "to hold a sentencing hearing where Jackson may present *Miller* evidence for consideration"); *People v. Carp*, 828 N.W.2d 685, 720, 723 (Mich. Ct. App. 2012) (listing the same seven factors as in *Bear Cloud* and directing the district court to consider those factors at the time of sentencing); *Parker*, 119 So. 3d at 998, 2013 WL 2436630, at *9 (vacating the defendant's sentence and "remand[ing] for hearing where the trial court, as the sentencing authority, is required to consider the *Miller* factors before determining sentence" (footnotes omitted)).

The law in this case is *Miller*. The pages of social science and history offered by the majority do not provide additional legal standards or meaningful guidance. They are unnecessary.

If some controverted point concerning *Miller* comes up after resentencing, we can address it then, based on briefing by the parties. Until then, we should let the district court do its work.

---

(e) "the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressure may have affected" the juvenile, *id.*;

(f) whether the juvenile "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth," e.g., the juvenile's relative inability to deal with police and prosecutors or to assist his own attorney, *id.*; and

(g) the juvenile's potential for rehabilitation, *id.*

*Bear Cloud*, 294 P.3d at 47. Note that the list has some overlap. For example, "circumstances of the offense" appears twice. In *Ragland* this court eliminates the overlap and thus compresses the list to five factors. *See Ragland*, 836 N.W.2d at 113 n.5.

At the end of its opinion, the majority tries to move into the practical world and explain "what the district court is required to do" to comply with *Miller*. However, I find the explanation unenlightening, and I fear our district courts will as well. My colleagues repeatedly say that "the district court must recognize" certain propositions. What does this directive mean? If it means that our trial judges must take on a certain state of mind when sentencing juveniles, how is that to be enforced? We don't usually remand cases for judges to "recognize" things.

At one point, the majority says the district court should make findings if it is not following "the general rule" that children "cannot be held to the same standard of culpability as adults in criminal sentencing." This also strikes me as an odd statement for the court to make. A conscientious trial judge can readily accept the proposition that a juvenile like Null should not be held to the same standard of culpability as an adult. So it is unclear to me that there would ever be an occasion for such a finding. However, the standard of culpability and the sentence are two different things. Just because a juvenile is held to a lesser standard of *culpability*, it does not follow that a juvenile cannot receive consecutive *sentences* when, as here, he intentionally shoots an unarmed bystander twice in the head and kills him in the course of an armed robbery.[13]

---

[13]My colleagues do not say that a district court must make specific findings on each of the *Miller* factors. To my knowledge, no published opinion in any other jurisdiction has held that such findings are required. *Cf. State v. Fletcher*, 112 So. 3d 1031, 1037 (La. Ct. App. 2013) (requiring only that the district court "state the reasons for sentencing on the record," something which our trial courts are already required to do).

**IV. The Majority's Decision to Apply *Miller* "Under" the Iowa Constitution Will Lead to Uncertainty.**

Historically, when interpreting the Iowa Constitution, this court has deferred to United States Supreme Court interpretations of similarly worded provisions of the United States Constitution. *See, e.g., State v. Musser*, 721 N.W.2d 734, 748 n.8 (Iowa 2006) ("Musser also challenges his sentence under the Iowa Constitution's prohibition of 'cruel and unusual punishment.' Iowa Const. art. I, § 17. Because the Iowa prohibition is similar to the federal prohibition, we look to the interpretation of the federal constitution for guidance in interpreting the state provision.").

Recently, however, we have said in various contexts that we may apply—or will apply—provisions of our constitution "more stringently" than corresponding provisions of the United States Constitution. *See, e.g., State v. Kooima*, 833 N.W.2d 202, 206 (Iowa 2013); *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012); *State v. Pals*, 805 N.W.2d 767, 772 (Iowa 2011); *Bruegger*, 773 N.W.2d at 883.

While I wholeheartedly agree we have the ultimate authority to interpret the Iowa Constitution, I have misgivings about these kinds of statements. We are all judges who seek to apply the law neutrally and fairly as we understand it. To say we apply the Iowa constitution "more stringently" is to import a value-laden terminology into our opinions. "Stringent" is not a term that helps one decide a particular case; it describes instead a mindset or outlook. It is like saying, "We are more protective of rights than the United States Supreme Court," or depending on your perspective, "We are more willing than the United States Supreme Court to overturn the decisions of the people's elected representatives."

When our court borrows from federal precedent but ultimately departs from it, we owe an obligation to be clear about the extent and nature of our departure and the analytical framework we are following. This helps trial judges and lawyers know what is expected of them in the future. "More stringent" does not fulfill that obligation.[14]

Having said that, it is one thing to make these statements when the underlying United States Supreme Court standard is a balancing test, such as whether a criminal sentence is "grossly disproportionate" to the underlying crime. *See Oliver*, 812 N.W.2d at 650; *Bruegger*, 773 N.W.2d at 883. In that case, some lack of clarity in the federal framework may justify a lack of clarity on our part. I still believe we ought to focus on explaining our decision making, and forego the use of simplistic terminology, but I can understand the court's position.

Here, however, we do not have that excuse. *Miller* is *not* a balancing case. It involves, rather, the "confluence" of two factors—(1) a mandatory life without parole sentence that was imposed without consideration of the mitigating qualities of youth on (2) an individual who committed a crime when under the age of eighteen. *See Miller*, ___ U.S. at ___, 132 S. Ct. at 2463–64, 183 L. Ed. 2d at 418. So *Miller* sets forth a clear federal constitutional rule that we should either follow or not follow. Regardless, we should be explicit about what we are doing.

---

[14]In lieu of responding to this point, the majority attacks a straw man. The majority accuses me of taking the position that "[a]ny decision to depart from federal precedent" is "value-laden." I have not said that. Certainly, it is possible for courts to engage in legitimate forms of state constitutional interpretation and come to a different conclusion from federal precedent. However, simply saying you interpret the state constitution "in a more stringent fashion" does not describe an actual method of interpretation.

My colleagues are not explicit. Rather, they say they are applying "the principles of *Miller*. . . under the Iowa Constitution." I do not know what this means. The only clue can be found in the preceding citation to *Bruegger*, where my colleagues include a parenthetical statement that we have applied "principles espoused in *Roper* in a more stringent fashion under the Iowa Constitution than had been explicitly adopted by the Supreme Court under the United States Constitution." This suggests my colleagues may be following something more than just *Miller*. But if so, they should say what it is, why they are taking this approach, and what in Iowa's constitution justifies it.

To my knowledge, no other state supreme court has applied *Miller* in this way. Other courts have simply implemented *Miller* and said that is what they are doing.[15]

**V. Conclusion**.

In sum, I believe the sentencing hearing in this case complied with *Miller*. But if a new sentencing hearing is necessary, we should just order it. And while we are at it, we should be forthright as to whether we

---

[15]Certain other state courts have expressly rejected the proposition their constitution requires something more than *Miller*. *See Conley*, 972 N.E.2d at 879–80 (holding that a LWOP sentence for a 17-year-old defendant was constitutional under a federal analysis because the sentence was discretionary, not mandatory, and further finding that the sentence did not violate Indiana's constitutional prohibition against cruel and unusual punishment); *Commonwealth v. Batts*, 66 A.3d 286, 288, 298–99 (Pa. 2013) (addressing a 14-year-old juvenile offender's LWOP sentence and finding nothing to suggest that Pennsylvania's constitutional prohibition against "cruel punishments" required a different approach regarding juveniles than that reflected in prevailing United States Supreme Court jurisprudence).

My colleagues try to justify their approach by stating that Null argued for it— "Null urges that we take the principles of *Miller* and apply them under the facts of this case under the Iowa Constitution." Actually, Null's state constitutional argument focused on *Bruegger* rather than *Miller*. *See* n.2.

are following *Miller* and, if not, what additional requirements we are imposing and why.

For the foregoing reasons, I respectfully concur in part and dissent in part.

Waterman, J., joins this concurrence in part and dissent in part.

**ZAGER, Justice (concurring in part and dissenting in part).**

I concur in the majority opinion which affirmed Null's convictions and the rulings on the claims of ineffective assistance of counsel. I respectfully dissent as to the reversal of the defendant's sentence.

Both the majority opinion and Justice Mansfield's opinion provide the factual background which leads us here, so I will not recite these facts again as part of this opinion. Because Null was sentenced before *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), we must answer the threshold question of whether *Miller* applies to the term-of-years sentence imposed by the district court. Next, we need to determine whether it was an abuse of discretion by the district court in sentencing Null to consecutive sentences rather than a concurrent sentence.

### I. *Miller* Does Not Apply to Null's Sentence.

The majority opinion does an excellent job of tracing the evolution of the Eighth Amendment jurisprudence involving juvenile offenders. I also agree that juveniles are constitutionally different from adults for imposition of a state's harshest penalties—either the death penalty or life without parole (LWOP). As the majority properly notes, however, none of the cases in the trilogy of *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005), *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), and *Miller*, 567 U.S. ___, 132 S. Ct. 2455, 183 L. Ed. 2d 407, involved sentences for lengthy terms of years that were not LWOP. Nor do these cases specifically address an aggregate term-of-years sentence. " '[I]t would be a great stretch to say that *Graham* meant to require legislatures and courts to treat youths and adults differently in every respect and every step of the criminal

process.' " *People v. Pacheco*, 991 N.E.2d 896, 906–07, 2013 WL 3193670, at *10 (Ill. App. Ct. 2013). Further, while the majority concludes that the *Miller* principles are fully applicable to a lengthy term-of-years sentence (functional equivalent or de facto LWOP), I am not prepared to reach the same conclusion.

I acknowledge that there is a split of authority on whether *Miller* or *Graham* should be applicable to a term-of-years sentence. Numerous courts have held that a term-of-years sentence, however long, does not fall within the principles of *Graham* and *Miller*.[16] Other courts have found that *Graham* prohibits any term-of-years sentence that prevents

---

[16]*See Bunch v. Smith*, 685 F.3d 546, 551–52 (6th Cir. 2012) (finding a state court's determination that a juvenile petitioner's eighty-nine-year sentence did not violate the Eighth Amendment was reasonable, and also noting that "no federal court has ever extended *Graham*'s holding beyond its plain language to a juvenile offender who received consecutive, fixed-term sentences"), *cert. denied*, 569 U.S. ___, 133 S. Ct. 1996 (2013); *Goins v. Smith*, No. 4:09–CV–1551, 2012 WL 3023306, at *2, *6 (N.D. Ohio July 24, 2012) (unpublished opinion) (citing *Bunch*, 685 F.3d at 551, to conclude that an eighty-four-year sentence is not unconstitutional); *Bell v. Haws*, No. CV09–3346–JFW (MLG), 2010 WL 3447218, at *8–10 (C.D. Cal. July 14, 2010) (unpublished opinion) (concluding that sentence of fifty-four years without parole did not violate *Graham* because *Graham* only applies to life sentences), *vacated for failure to exhaust state remedies sub nom. Bell v. Lewis*, 462 F. App'x 692, 693 (9th Cir. 2011); *State v. Kasic*, 265 P.3d 410, 413, 415 (Ariz. Ct. App. 2011) (upholding aggregate sentence of 139.75 years and declining to extend the reasoning in *Graham*); *Walle v. State*, 99 So. 3d 967, 968, 971 (Fla. Dist. Ct. App. 2012) (concluding that effective total sentence of ninety-two years did not constitute cruel and unusual punishment or fall within the parameters of *Graham*); *Henry v. State*, 82 So. 3d 1084, 1086, 1089 (Fla. Dist. Ct. App. 2012) (concluding that ninety-year sentence was constitutional under *Graham* and refusing to apply *Graham* to a term-of-years sentence without further guidance from United States Supreme Court), *review granted*, 107 So. 3d 405 (Fla. 2012); *Manuel v. State*, 48 So. 3d 94, 97, 98 n.3 (Fla. Dist. Ct. App. 2010) (applying *Graham* to juvenile offender's sentence of life without parole, but holding forty-year sentence on second conviction constitutional), *cert. denied*, ___U.S. ___, 132 S. Ct. 446 (2011); *Middleton v. State*, 721 S.E.2d 111, 112–13 (Ga. Ct. App. 2011) (concluding that aggregate sentence of thirty years without parole for multiple convictions did not implicate *Graham* because the defendant received a term-of-years sentence), *cert. denied*, ___ U.S. ___, 133 S. Ct. 867 (2013); *State v. Brown*, 118 So. 3d 332, 335, 2013 WL 1878911, at *5–6, *15 (La. 2013) (finding seventy–year sentence for "multiple offenses resulting in cumulative sentences matching or exceeding his life expectancy" is constitutional, as *Graham* is not applicable).

the defendant from receiving a meaningful opportunity to obtain release.[17]     Based upon this split of authority, and the underlying reasoning not to extend the principles of *Graham* and *Miller* to term-of-years sentences for juveniles, I would conclude that no resentencing is necessary here.

An expansion of the *Graham* and *Miller* requirements to cases involving term-of-years sentences similar to Null's would also lead to uncertainty and confusion.

As the Sixth Circuit notes in *Bunch v. Smith*:

> "At what number of years would the Eighth Amendment become implicated in the sentencing of a juvenile: twenty, thirty, forty, fifty, some lesser or greater number? Would gain time be taken into account? Could the number vary from offender to offender based on race, gender, socioeconomic class or other criteria? Does the number of crimes matter? There is language in the *Graham* majority opinion that suggests that no matter the number of offenses or victims or type of crime, a juvenile may not receive a sentence that will cause him to spend his entire life incarcerated without a chance for rehabilitation, in which case it would make no logical difference whether the sentence is " 'life' " or 107 years. Without any tools to work with, however, we can only apply *Graham* as it is written."

---

[17]*United States v. Mathurin*, No. 09–21075–Cr., 2011 WL 2580775, at *3 (S.D. Fla. June 29, 2011) (unpublished opinion) (concluding that a mandatory minimum federal sentence of 307 years imprisonment for a juvenile was unconstitutional); *People v. Caballero*, 282 P.3d 291, 295 (Cal. 2012) (concluding that "[s]entencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment"); *Floyd v. State*, 87 So. 3d 45, 47 (Fla. Dist. Ct. App. 2012) (concluding two consecutive forty-year sentences violated *Graham* because the consecutive sentences were "the functional equivalent of a life sentence without parole"); *State v. Macon*, 86 So. 3d 662, 665–66 (La. Ct. App. 2012) (holding that serving fifty years before parole consideration violated *Graham* because the offender would be sixty-seven by that time and would therefore have no " 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' "), *writ denied*, 90 So. 3d 411 (La. 2012).

685 F.3d at 546, 552 (6th Cir. 2012) (footnote omitted) (quoting *Henry v. State*, 82 So. 3d 1084, 1089 (Fla. Dist. Ct. App. 2012), *review granted*, 107 So. 3d 405 (Fla. 2012)), *cert. denied*, 569 U.S. ___, 133 S. Ct. 1996 (2013).

The majority also notes that after *Miller*, the Supreme Court in several cases involving aggregate crimes, granted certiorari, vacated the sentence, and remanded the cases for reconsideration in light of *Miller*. However, each of the cases cited by the majority requiring remand included the predicate LWOP sentence in a homicide context which is distinguishable from the term-of-years sentence imposed in Null. *See Blackwell v. California*, 578 U.S. ___, ___, 133 S. Ct. 837, ___, 184 L. Ed. 2d 646, 646 (2013) (granting, vacating, and remanding *People v. Blackwell*, 134 Cal. Rptr. 3d 608, 618 (Ct. App. 2011) (life-without-parole sentence for first-degree murder, burglary of an inhabited dwelling, and attempted robbery of an inhabited dwelling)); *Mauricio v. California*, 568 U.S. ___, ___, 133 S. Ct. 524, 524, 184 L. Ed. 2d 335, 335 (2012) (granting, vacating, and remanding *People v. Mauricio*, No. B224505, 2011 WL 5995976, at *9 (Cal. Ct. App. Nov. 28, 2011) (unpublished opinion) (three life-without-parole sentences for juvenile convicted of three counts of first-degree murder)); *Bear Cloud v. Wyoming*, 568 U.S. ___, ___, 133 S. Ct. 183, 183–84, 184 L. Ed. 2d 5, 5 (2012) (granting, vacating, and remanding *Bear Cloud v. State*, 275 P.3d 377, 402 (Wyo. 2012) (life-without-parole sentence for juvenile convicted of first-degree murder, conspiracy to commit aggravated burglary, and aggravated burglary)); *Whiteside v. Arkansas,* 567 U.S. ___, ___, 133 S. Ct. 65, 66, 183 L. Ed. 2d 708, 708 (2012) (granting, vacating, and remanding *Whiteside v. State*, 383 S.W.3d 859, 865–66 (Ark. 2011) (life-without-parole sentence for juvenile for capital murder and thirty-five years for

aggravated robbery)). Rather than suggesting that these cases were remanded by the Supreme Court based on an aggregation of sentences, it is my opinion that the cases were summarily remanded for precisely what *Miller* requires: no imposition of LWOP without an individualized assessment of the juvenile utilizing the *Miller* factors.

Clearly there is no overall consensus that *Graham* or *Miller* should apply to cases involving a de facto or functional equivalent of LWOP. The United States Supreme Court has had the opportunity to review cases that would allow it to expand the reasoning in *Graham* and *Miller* to cases of de facto life sentences very similar to the one given to Null, and it has declined to do so. *See, e.g., Bunch*, 685 F.3d at 552 (stating that since the defendant was not sentenced specifically to "life without parole," there is no violation under *Graham*, and if "the [United States] Supreme Court has more in mind, it will have to say what it is"), *cert. denied*, 569 U.S. ___, 133 S. Ct. 1996. In the absence of further direction and guidance from the United States Supreme Court, I would not expand the requirements of *Graham* and *Miller* to juvenile sentences for a term of years. Therefore, I would affirm the sentence imposed by the district court.

**II. The District Court Did Not Abuse Its Discretion in Making Null's Sentences Consecutive.**

Null argues that the district court abused its discretion by imposing consecutive sentences. The majority does not reach the question, but does recognize that the question of whether a defendant's sentences will run concurrently or consecutively ordinarily "rests within the sound discretion of the district court." As we have previously observed,

the decision of the district court to impose a particular sentence within the statutory limits is cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters.

*State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). Further, we will only find an abuse of discretion if "we are able to discern that the decision was exercised on grounds or for reasons that were clearly untenable or unreasonable." *Id.*

In order to comply with its statutory duty, the district court is required to determine a sentence based on what "is authorized by law for the offense," and which sentence will, "in the discretion of the court, . . . provide maximum opportunity for the rehabilitation of the defendant, and for the protection of the community from further offenses by the defendant and others." Iowa Code § 901.5 (2009).

We have provided guidance to district court judges in applying their discretion, stating that judges should

> "[w]eigh and consider all pertinent matters in determining proper sentence, including the nature of the offense, the attending circumstances, defendant's age, character and propensities and chances of his reform. The courts owe a duty to the public as much as to defendant in determining a proper sentence. The punishment should fit both the crime and the individual."

*State v. Leckington*, 713 N.W.2d 208, 216 (Iowa 2006) (quoting *State v. August*, 589 N.W.2d 740, 744 (Iowa 1999)). We have consistently stated that "[a] statement may be sufficient, even if terse and succinct, so long as the brevity of the court's statement does not prevent review of the exercise of the trial court's sentencing discretion." *State v. Hennings*, 791 N.W.2d 828, 838 (Iowa 2010) (citation and internal quotation marks omitted).

In pronouncing sentence here, the district court emphasized that Null had received "significant juvenile court intervention . . . that date[d] back to . . . at least early 2005 according to the presentence report." The court noted Null's resistance to offered interventions and stated, "I can't lose sight also that Mr. Null went to this apartment with a loaded gun and the victim was shot in the head." The court concluded: "[B]ased on all the information before me, I feel that consecutive sentences are appropriate in this case." The court articulated the reasons for the conclusion as follows:

> In determining the sentence as I have summarized here in open court, I have considered the entirety of the presentence report including the recommendation that was made by the report writer. I did consider that and determined that I was not going to follow that recommendation.
>
> I consider the nature and circumstances of the offenses, consider the history and characteristics of the Defendant including his age and prior interventions that I have mentioned. I have considered the recommendation of both counsel in this case. I find the sentence that I have imposed offers the Defendant the maximum opportunity for rehabilitation, balanced against the interests of the community, not only protecting the community but also in receiving justice for what can only be described as a tragedy for all.

I conclude that the district court did not abuse its discretion in sentencing Null to consecutive sentences for his very serious crimes.

**III. Conclusion.**

For the foregoing reasons, I would affirm the sentence imposed by the district court.